IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,773

In the Matter of UCHECHI OKECHUKWU NWAKANMA,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed July 7, 2017. Disbarment.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the formal complaints for the petitioner.

Respondent did not appear.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Uchechi Okechukwu Nwakanma, of Houston, Texas, an attorney admitted to the practice of law in Kansas in 2003.

On October 1, 2013, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on October 23, 2013. On February 3, 2016, the Disciplinary Administrator filed an amended formal complaint. After filing a motion for extension of time to file an answer, which was granted by the panel on February 25, 2016, respondent filed an amended answer on March 25 and 28, 2016. Upon motion granted June 27, 2016, the Disciplinary Administrator amended the formal complaint to add an allegation that the respondent violated KRPC 3.4 (2017 Kan. S. Ct. R. 345).

1

A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on July 25-29, 2016, where the respondent appeared in person without counsel. Because the respondent possesses a Kansas license, the hearing panel analyzed both Kansas and Texas rules as they relate to the respondent's misconduct. The hearing panel determined that respondent violated Texas Disciplinary Rules of Professional Conduct: 1.01 (competence and diligence); 1.03 (communication); 1.04 (fees); 1.14 (safekeeping property); 1.15 (declining or terminating representation); 3.04 (fairness in adjudicatory proceedings); 8.01 (bar admission, reinstatement, and disciplinary matters); and 8.04 (misconduct) and the following Kansas Rules of Professional Conduct: 1.1 (2017 Kan. S. Ct. R. 287) (competence); 1.3 (2017 Kan. S. Ct. R. 290) (diligence); 1.4 (2017 Kan. S. Ct. R. 291) (communication); 1.5 (2017 Kan. S. Ct. R. 292) (fees); 1.15 (2017 Kan. S. Ct. R. 326) (safekeeping of property); 1.16 (2017 Kan. S. Ct. R. 331) (termination of representation); 3.4 (2017 Kan. S. Ct. R. 345) (fairness to opposing party and counsel); 8.1 (2017 Kan. S. Ct. R. 377) (bar admission and disciplinary matters); 8.4 (2017 Kan. S. Ct. R. 379) (misconduct); and Kansas Supreme Court Rule 207 (2017 Kan. S. Ct. R. 246) (cooperation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"License History

"43. The Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas on September 26, 2003. The respondent's license to practice

law in Kansas has been suspended for failing to comply with the annual requirements on six occasions:

a.       On October 8, 2008, the Court entered an order suspending the respondent's license to practice law for failing to pay the attorney registration fee and continuing legal education fee. The Court reinstated the respondent's license to practice law on October 22, 2008.

b.       On October 6, 2009, the Court entered an order suspending the respondent's license to practice law for failing to pay the continuing legal education fee. On January 14, 2010, the Court reinstated the respondent's license to practice law.

c.       On October 18, 2010, the Court entered an order suspending the respondent's license to practice law for failing to pay the continuing legal education fee. The Court reinstated the respondent's license to practice law on October 25, 2010.

d.       On September 14, 2012, the Court entered an order suspending the respondent's license to practice law for failing to fulfill the annual continuing legal education requirements. On December 18, 2012, the Court reinstated the respondent's license to practice law.

e.       On October 6, 2015, the Court suspended the respondent's license to practice law for failing to pay the attorney registration fee and the continuing legal education fee. The Court issued an order reinstating the respondent's license to practice law on December 18, 2015. However, the check that the respondent provided to pay the attorney registration fee and late fees was returned for insufficient funds. Additionally, the check that the respondent provided to pay the continuing legal education fee and late fee was also returned for insufficient funds. During the hearing, the respondent blamed his nonlawyer assistant for the suspensions and the submission of bad

checks. Shortly after the amended formal complaint was filed on February 3, 2016, the respondent provided funds to cover the bad checks.

f. On October 6, 2016, the Court suspended the respondent's license to practice law for failing to pay the annual attorney registration fee, for failing to comply with the annual continuing legal education requirements, and for failing to pay the annual continuing legal education fee. As of this writing, the respondent's license remains suspended.

"44. While the respondent was licensed to practice law in Kansas, he has never practiced law in Kansas. The respondent's practice has been exclusively in Houston, Texas.

"45. The respondent has never been licensed to practice law in the state courts of Texas. The respondent took and failed the Texas bar examination 'about two times.'

"46. Based upon his Kansas license, the respondent was admitted to practice in the United States District Court for the District of Kansas, the United States immigration courts, the United States District Court for the Southern District of Texas, and the United States Court of Appeals for the Fifth Circuit. The current status of the respondent's license to practice law in every jurisdiction where he has been admitted is relevant. K.S.A. 60-409(b)(4) provides that '[j]udicial notice may be taken without request by a party, of . . . specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy.' Additionally, judicial notice may be taken of matters of public record in other courts or governmental bodies. *See Cities Service Gas Co. v. State Corporation Commission*, 192 Kan. 707, 714, 391 P.2d 74 (1964); *Board of County Com'rs of Shawnee County v. Brookover*, 198 Kan. 70, 76, 422 P.2d 906 (1967). The hearing panel therefore takes judicial notice of the records of United States District Court for the District of Kansas, the United States District Court for the Southern District of Texas, and the United States Court of Appeals for the Fifth Circuit, as set forth in Documents 84, 85, and 86. Those records reflect:

a. In 2003, the United States District Court for the District of Kansas admitted the respondent to the practice of law in its court. However, since 2003, the respondent has not paid any registration fees. Accordingly, the United States District Court for the District of Kansas terminated the respondent's license to practice in its court in 2004.

b. On December 10, 2015, based on the 2015 suspension of his Kansas license to practice, the Board of Immigration Appeals entered an order indefinitely suspending the respondent's license to practice law in immigration courts. As a result of the suspension order, the respondent may not practice before the immigration courts, the Board of Immigration Appeals, and all offices of the Department of Homeland Security.

c. The respondent's license [] to practice in the United States District Court for the Southern District of Texas expired on November 7, 2013.

d. The respondent's license to practice before the United States Court of Appeals for the Fifth Circuit expired on February 6, 2011.

"DA11473 – Representation of U.I.

"47. On June 25, 2009, the United States Attorney filed a criminal complaint against U.I. in the United States District Court for the Southern District of Texas, Houston Division. Thereafter, on July 23, 2009, a grand jury returned a criminal indictment against U.I. On October 19, 2009, a grand jury returned a superseding indictment against U.I. and on March 25, 2010, a grand jury returned a second superseding indictment charging U.I. with 55 felony counts of health care fraud, mail fraud, and money laundering. In the second superseding indictment it was alleged that U.I. and other defendants billed Medicare and Medicaid for fraudulent claims and, as a result, received thirty million dollars.

"48.     On July 7, 2009, K.A., U.I.'s business manager, approached the respondent about representing U.I. in the criminal case. The respondent agreed to meet with U.I. On July 8, 2009, the respondent met with U.I. at the Joe Corley Detention Center. At that time, the respondent had less than 6 years' experience practicing law. Following their meeting, despite the respondent's inexperience having not yet tried a jury trial nor handled a Medicare or Medicaid fraud case, the respondent agreed to represent U.I.

"49.     At the hearing on this matter, the respondent initially testified that he had not tried any jury trials. Later, he asserted that he had tried one jury trial, however, he could not remember his client's name, the nature of the case, or when it was tried. If the respondent had actually tried one and only one jury trial in his life, the hearing panel believes that he would have some memory of that case.

"50.     The respondent advised U.I. that the case was complex and that he intended to associate with other counsel. The respondent told U.I. that if no other counsel was found to represent U.I., the respondent's firm would represent U.I. The respondent told U.I. that he would require a fixed $3,000,000 nonrefundable fee. The respondent told U.I. that the fee would cover all investigative costs and attorneys' fees charged by other counsel the respondent would retain to represent U.I.

"51.     On July 9, 2009, the respondent returned to the Joe Corley Detention Center with a fee contract. The respondent and U.I. signed the contract. The contract provided, in pertinent part, as follows:

'3. SCOPE OF REPRESENTATION:  Prince & Associates and Client agree that Prince & Associates will select, interview and hire suitable Law firms, attorneys, investigators, and other experts in representing and defending client in the pending case. Prince & Associates will associate, coordinate and supervise other lawyers, Law firms and other entities it hired in reviewing, negotiating, preparing for trial and in trying said case. If Prince & Associates is unable to find a suitable law firm or attorneys to associate with in the litigation of pending matter, Prince & Associates

6

is allowed to represent client solely and alone using Prince & Associates in-house attorneys.

'4. FEES: Clients agrees that it will pay Prince & Associates the sum of $3 million (three million) U.S. dollars in GOOD AND LAWFUL FUNDS as retainer for representing client in the pending case. Client agrees and understands that the fees quoted above are only legal fees, and does not include ancillary costs, such as the costs of filing fees, long distance calls, or communications, investigations, depositions, transcripts, copies, expert witness, etc. Client agrees that the above fees do not include appeals or costs associated with appeals, court litigation or services other than one listed above. Client shall reimburse Prince & Associates for any expenses incurred in this matter such as long-distance calls, mailing costs, copying costs, etc [*sic*] as applicable. Incase [*sic*] of appeal, client understands and agrees that he has the right to retain any attorney of his choice to appeal his case and does not have to retain Prince & Associates in his appeal. However, if client further retains Prince & Associates for appeal, client agrees that new fees will be charged.

'5. NON-REFUNDABLE FEES: Client agrees that the pending case has gathered lots of media publicity and it is very complex. Client agrees that said case will be extremely time consuming and requires lots of attention. Client further agrees that in the process of representing client, Prince & Associates and other attorneys involved in this case will have to reject potential businesses and clients in order to give the required attention and time involvement in his case. Client agrees that he does not want to plead guilty to the charges on the indictment and that he is authorizing Prince & Associates in conjunction with other lawyers or Law firms to prepare his case for trial. Client further acknowledges that such trial preparation will be time consuming and may lead to potential economic loss to Prince & Associates, P.C [*sic*] and or its associates or lawyers. Therefore by affixing his signature below, CLIENT UNDERSTANDS, AGREES AND CONSENTS that the THREE MILLION DOLLARS retainer fees

7

is NON-REFUNDABLE AND WHOLLY EARNED SO LONG AS Prince & Associates or in conjunction with other lawyers and or other Law firms complete the pending matter with the U.S [*sic*] District Court for the Southern District of Texas. However, should Prince & Associates and or any of his associates, attorneys or other Law firms Prince & Associates hires to represent client BE TERMINATED by client in WRITING for any reason prior to the completion of client's representation or trial, Prince & Associates, P.C [*sic*] will bill for the services it so far rendered at the rate of $500 per hour and will account and refund any unused or unearned retainer fees to enable client [*sic*] hire a different attorney to complete his case.

'6. NO OBLIGATION TO PAY OTHER LAWYERS:  Client understands and agrees that he has no other obligation to pay any retainer fees or attorney fees to any other lawyers, attorneys or Law firms that Prince & Associates has hired to represent client or to help in the pending matter. Client consents and agrees that Prince & Associates will share its retainer fees with these lawyers, attorneys, associates or Law firms. However, Prince & Associates, P.C [*sic*] will not be responsible for any attorney fees incurred by any other lawyers that Prince & Associates, P.C [*sic*] did not hire or select in connection with the pending case.

. . . .

'10. KEEPING CLIENT INFORMED:  Prince & Associates, P.C [*sic*] and or its associates will make periodic visitation to client in detention to keep client informed of all updates on his case. Upon client's authorization, Prince & Associates will keep client's families updated on client's case and will answer any questions client or his family may have regarding client's case.'

At the hearing on this matter, the respondent testified that all expenses were to be paid out of the $3,000,000 attorney fee. The respondent further testified that the provision in the contract to the contrary was in error.

"52.     At some point, U.I. also retained Kenneth Nnaka to represent him. U.I. and Mr. Nnaka entered into a fee agreement and U.I. agreed to pay an initial advance fee of $20,000. Further, U.I. agreed to pay for subsequent representation after the initial advanced fee was exhausted. Mr. Nnaka commenced the representation and U.I. issued a check in the amount of $10,000. Mr. Nnaka traveled to Nigeria on behalf of U.I. to handle U.I.'s business affairs. Upon Mr. Nnaka's return from Nigeria, U.I. stopped payment on the $10,000 and refused to pay Mr. Nnaka for his time and expenses incurred in traveling to Nigeria on behalf of U.I. Mr. Nnaka sued. Later, Mr. Nnaka's motion for summary judgment was granted.

"53.     Between July 14, 2009, and February 12, 2010, U.I. paid the respondent a total of $2,170,808.49, as follows:

| | |
|---|---|
| July 14, 2009 | $200,000.00 |
| August 11, 2009 | $200,000.00 |
| September 24, 2009 | $20,000.00 |
| November 5, 2009 | $749,927.38 |
| November 12, 2009 | $550,927.11 |
| February 5, 2010 | $200,000.00 |
| February 12, 2010 | $249,954.00 |
| TOTAL | $2,170,808.49 |

There are many references in the record that U.I. paid a total of $1,950,000 to the respondent. However, the evidence clearly establishes wire transfers from U.I. to the respondent for a total of $2,170,808.49. U.I. did not pay the balance of the fee agreed to in the fee agreement.

"54.     Throughout the representation of U.I., the respondent met with and interviewed a variety of lawyers and retained a number of lawyers on behalf of U.I. to assist with the defense of the criminal charges.

9

"55.     Additionally, while U.I.'s charges were pending, the respondent assisted U.I. with a variety of personal matters—including keeping U.I.'s family informed regarding the status of the case, paying bills for U.I. out of the attorney fees received by the respondent, permitting U.I. to make telephone calls to Taiwan and Nigeria from jail through the respondent's law office, and providing the various attorneys representing U.I. with information regarding the nuances of the Nigerian culture. Most of these services, however, were not included in the scope of the representation as detailed in the fee agreement. The scope of the representation was limited to locating attorneys, coordinating attorneys, providing legal representation, and updating U.I. and his family regarding the status of the representation, all in the criminal case.

"56.     During the period of time the respondent represented U.I., the respondent was unable to accept certain representations. However, the respondent continued to actively represent many other clients. The respondent asserted that he was unable to attend to other business matters. However, it is clear that the respondent continued to be active in the management of a number of businesses in which the respondent had an ownership interest.

"57.     The respondent made contact with Esteban Pena, a 35-year-old attorney practicing in the same building as the respondent. The respondent asked Mr. Pena if he had previously represented defendants in federal criminal matters. Mr. Pena told the respondent that he had not, but that he knew an attorney who did have that type of practice. Mr. Pena recommended that the respondent contact Ralph Martinez.

"58.     The respondent asserted that he hired Mr. Pena to represent U.I. as part of the defense team. Specifically, the respondent alleged that he paid Mr. Pena $50,000 in the form of a cashier's check for the representation, prior to Mr. Pena's death from a heart attack. The respondent asserted that the $50,000 came from the respondent's personal funds held in cash in his safe. However, Mr. Pena's widow, who served as the office manager for Mr. Pena's solo practice, testified as follows:

'Q.     Was—was there an occasion where Mr. Pena referred a case to
        Mr. Nwakanma concerning Medicare fraud?

10

'A.     'Um, he didn't refer the case to Prince, Prince came to my husband and asked my husband if he did federal criminal defense. Steven told him he did not, but his mentor and really good friend, Ralph Martinez, was a really good attorney that did a lot of federal work. And so he referred the case. You know, he told him if you need a really good attorney, this is the person you should hire.

'Q.     Do you know if Mr. Martinez took the case?

'A.     He did take the case, but it was very briefly. I think he probably had one court hearing, that I remember—that I remember of, 'um, which was, like, a bond hearing. And shortly after Prince didn't want to pay his—his retainer and he was fired from the case.

'Q.     Do you know if Mr. Pena ever went with Mr. Martinez to go see that client up at the Joe Corley Facility?

'A.     Yes, he did. Yes, he did.

'Q.     Why did he go with him?

'A.     Because Ralph was going to teach him how to do these federal cases.

'Q.     So he was kind of shadowing. Is that—

'A.     Exactly. Yes, ma'am.

'Q.     Was Mr. Pena hired to work on [U.I.]—was that the defendant's name, [U.I.], the client?

11

'A.    Yeah. No, ma'am.

'Q.    I'm sorry.

'A.    He was not hired.

'Q.    He was not hired to work on that case?

'A.    No. No, ma'am.

'Q.    And just for clarification, was [U.I.] the defendant that had the federal case that we're talking about that Mr. Prince hired Mr. Martinez on?

'A.    Yes, ma'am.

'Q.    Okay. And so Mr. Pena was never hired to work on that case. Is that what you're saying?

'A.    No, ma'am.

'Q.    Now, Mr. Nwakanma said that he paid Mr. Pena $50,000 to represent-- or to work on [U.I.]'s case. Is that true?

'A.    No, ma'am.

'Q.    And how would you know that?

'A.    Well, because I dealt with all accounts receivables. 'Um, Steven never was an attorney of record, and I doubt that he paid Steven $50,000, if he didn't even pay the actual attorney that he hired to do the case. I think he—I think we were charging—or Ralph was charging about 40,000, if I remember. I don't remember exactly the numbers, but I think he only paid him 12 to 13,000, if I

12

remember correctly. 'Um, Steven was highly embarrassed because he was the one that recommended Mr. Ralph Martinez to Prince, okay, and Prince didn't finish paying the retainer.

'Q.     If a $50,000 was paid to Mr. Pena, would you have known about it?

'A.     Absolutely.

'Q.     Would that have been a lot of money for the Pena Firm?

'A.     It would have been a lot of money and I wouldn't have struggled burying my husband September the 4th when he passed away because I would have had that money in the account.'

Additionally, on cross-examination, Ms. Pena testified:

'Q.     Okay. Ma'am, can we establish the fact that you cannot sit out here and testify you knew everything that happened in your husband's life?

'A.     What I can sit down and testify is that I knew every penny that came into our practice, because at the end of the day I took accounting of account receivables, and I was his wife. Before he took one dime out of any accounts, I already knew about it.

'Q.     So if my secretary testified they give a check actually to your husband and come to testify. Would that be correct?

'A.     I can hear anything, but if you can prove to me that you give him a $50,000 check, then I would be extremely surprised.'

Based upon all the evidence presented, the hearing panel finds that the respondent did not retain Mr. Pena or pay him $50,000 to represent U.I.

13

"59.     Mr. Pena introduced Mr. Martinez to the respondent. Mr. Martinez agreed to represent U.I. through the complete resolution of the case for $40,000. Thereafter, Mr. Martinez and Mr. Pena met with U.I. in the prison. When they arrived at the prison to meet with U.I., the respondent was also present. On September 4, 2009, Mr. Pena suffered a heart attack and died.

"60.     The respondent initially paid Mr. Martinez $10,000 of the agreed fee. Later, the respondent paid Mr. Martinez an additional $5,000. The respondent failed to pay Mr. Martinez any additional fees.

"61.     Mr. Martinez represented U.I. at the bond hearing. In addition to Mr. Martinez, other attorneys that the respondent had retained for U.I. were also present at the bond hearing but did not participate in the hearing, as Mr. Martinez was counsel of record. The court denied the request for bond and U.I. remained in detention.

"62.     U.I. was dissatisfied that he remained in prison without bond and directed the respondent to replace Mr. Martinez. The respondent contacted Abraham Fisch. Mr. Fisch agreed to represent U.I. On behalf of U.I. the respondent provided Mr. Fisch with a cashier's check in the amount of $250,000 for the representation.

"63.     By this time, U.I. had expressed some amount of dissatisfaction with the respondent's services. It appears that U.I. believed that the respondent was 'cheating' him. In an email message, the respondent stated that if U.I. continued to feel that same way, the respondent would be exiting the case immediately. At the hearing on this matter, the respondent testified that U.I. was satisfied with the respondent's assistance until he was convicted at trial. Relying on the respondent's email message, the hearing panel concludes that the respondent's testimony in this regard to be false.

"64.     After Mr. Fisch was retained to represent U.I., Mr. Fisch told U.I. that in return for payment of a large fee, an associate would pay off a government official in Washington, D.C. Mr. Fisch promised U.I. that the criminal charges would be dismissed.

14

"65.     In November 2009, U.I. deposited a total of $1,300,854.49 into the respondent's attorney trust account. *See* ¶ 53, above. If U.I. is to be believed, the $1,300,854.49 was to be used to pay off the governmental official to obtain a dismissal of the charges against U.I.

"66.     Thereafter, Mr. Fisch called Mr. Martinez and informed him that he had been retained to represent U.I. Then, Mr. Martinez called the respondent and the respondent told Mr. Martinez that his services were no longer needed. Mr. Martinez told the respondent that only U.I. could terminate the representation. Mr. Martinez traveled to the prison and met with U.I. U.I. terminated Mr. Martinez' representation.

"67.     Following his meeting with U.I. in prison, on December 4, 2009, Mr. Martinez filed a motion to withdraw from the representation of U.I. On December 15, 2009, the court granted Mr. Martinez' motion to withdraw. Mr. Martinez provided his file to Mr. Fisch.

"68.     When Mr. Fisch was also unable to get U.I. released from prison, U.I. became dissatisfied with Mr. Fisch's representation. The respondent continued to look for other attorneys to represent U.I.

"69.     As an aside, Mr. Fisch also made similar promises to other individuals facing criminal charges. Later, Mr. Fisch was charged with obstruction of justice, money laundering, conspiracy to commit money laundering, and failure to file tax returns. Mr. Fisch was convicted and sentenced to prison.

"70.     Ultimately, in February 2011, the respondent retained Dick Deguerin and Sean Buckley to represent U.I. Mr. Deguerin had extensive experience in Medicare and Medicaid fraud defense. Additionally, Mr. Buckley had significant experience representing federal criminal defendants, having represented criminal defendants in approximately 20 federal criminal jury trials.

"71.     Mr. Deguerin's fee letter, read, understood, and agreed to in writing by U.I., provided:

'You have asked that I represent you in a federal indictment alleging health care fraud in the United States District Court for the Southern District of Texas, Houston Division. We have agreed upon a non-refundable contract fee of $250,000 for me to handle your case. This fee does not include the cost of out-of-pocket expenses, and we have agreed that you will provide a $100,000 deposit through attorney Prince Uche Nwakanma, for out-of-pocket expenses. I will continue to associate Attorney Prince Uche Nwakanma, to assist with your defense, but you will be responsible for his attorney's fees.

. . . .

'When I say that I will "handle your case," I mean that I will represent you once through the trial court level of this case, including post-verdict motions if and when they are necessary. . . .

. . . .

'Normally, I require that my contract fee and the expense deposit be paid in full before I begin my representation. However, given that I sympathize with your financial situation and trust you, I am making a very rare exception. You and I have agreed to the following payment arrangements:

> You have paid $200,000 of the fee now, and upon
> receipt of that payment I am immediately beginning
> work on your case. The remainder of the fee, plus the
> expense deposit, must be paid within 45 days from the
> date of this letter. If the remaining fee and expense
> deposit are not timely paid, I reserve the right to keep all
> money paid me and to either withdraw from your case or
> to reassign it to another lawyer within my firm.'

When Mr. Deguerin calculated the fee, Mr. Deguerin and Mr. Buckley anticipated that U.I.'s trial may last a month. The respondent paid $200,000 on behalf of U.I. to Mr. Deguerin out of the monies received from U.I. Neither the respondent nor U.I. paid Mr. Deguerin any additional fees nor did they pay the $100,000 expense deposit.

"72.    Because the respondent did not pay Mr. Deguerin's total fee, Mr. Buckley, took over U.I.'s representation. While Mr. Buckley relied on the respondent to explain the cultural nuances of the Nigerian community and to assist Mr. Buckley in interfacing with witnesses in the Nigerian community, Mr. Buckley did not anticipate, need, or rely on any assistance from the respondent in representing U.I.

"73.    On September 14, 2010, U.I. wrote to the respondent. In the letter, U.I. stated:

'It's [*sic*] about 3 months you've failed to visit or keep in-touch with me over the phone. Last time we spoke on the phone was last June 23th [*sic*] 2010—night; reference to the scheduled court case on 06/24/10. And your answer to that was "you didn't know. [*sic*]

'There are a couple of reasons I'm writing this letter to you and it's absolutely important that you respond to it A.S.A.P.

'1, I will very much like to know about the pending case between Kenneth Nnaka, Attorney at Law—Plaintiff Vs. [U.I.] —Defendant.

'2, in reference to our continuous discussion last time you visited me here at Joe Corley Detention Facility, regarding [ ] of my legal money in your possession. I will very much like to get a certified receipt of how the money ($1.3m) One million three hundred thousand dollars was disbursed between Mr. Lloyd Williams and Abraham Fisch. Alternatively, [ ] will like to see all bank payment receipts showing how the total amount was disbursed in order to determine what line [ ] action to take in recovering the total balance of my money with you as the

17

retained supervising/organiser [*sic*] of my pending alleged health care fraud case.

'3, I am also requesting for copies of all correspondences [*sic*] regarding all efforts made in recovering the total amount paid to both Mr. Lloyd Williams and Mr. Abraham Fisch [*sic*]

'Thanks for your continuous co-operation and understanding.

'I expect to see or read from you soon.'

The respondent denied receiving this letter and asserted that U.I. 'made up' the letter. As detailed in ¶ 160(b), the hearing panel finds that the respondent's testimony in this regard lacks credibility.

"74.     The jury trial was held in May 2011. On May 27, 2011, the jury unanimously found U.I. guilty of 48 felony crimes. At the sentencing hearing, held in October 2011, the court sentenced U.I. to prison for 327 months. The court ordered U.I. to pay restitution of $27,189,349.76 to Medicare and $3,027,242.39 to Medicaid.

"75.     On August 30, 2011, U.I. wrote to the respondent. That letter provided:

'It's been a while we haven't spoken, I hope all is well with you, family and business. The stressful three weeks trial has come and gone in favor of the government. Since then I have been expecting to see or hear from you, but to no avail.

'Thank you so much for the ($5,000.00) five thousand dollars released to my son [] for my daughter [] school fees.

'Now let me start with the issue we both seem to get somewhat excited. First, I would like you to take a deep breath with your eyes closed in a private place, try meditating believing you are standing before our Heavenly Father God as a Christian (Head of family) in need with family

18

"wife and children" to be specific. As you gently open your eyes, try recalling how it all began.

'I had previously on 09/14/2010 written to you requesting for a clear and detailed accounting statements of my legal fund in your custody, but as at this day you have not been able to furnish me with the statement and of course, showing the balance due to me. It is absolutely against the law. While I patiently wait for your early response to that effect, I like to remind not to deviate from your early promise of going to maintain payments of my house mortgage as well as the children's school fees and expenses. Essentially, the children needs a place they can recline after a hard days toil which has become part of life everywhere in the world—especially in the case of my poor children whose father has been incarcerated for over 2 years now. You can imagine the mental anguish the situation is causing them.

'In my other case also, let me take it a little backward—if you can recall. Sometime (2006) I retained you/your law firm as my immigration Attorney, I was working with you (Your Law Firm) regarding changing to my status citizenship which didn't end up well for laxity of follow-ups interview from your office, and not for nonpayment of the services as I paid you complete. But [] that never baized [*sic*] or impacted my mind in accepting [K.A.]'s choice of appointing you to manage/assist with finding a solution to my legal problems. I accepted his approval of you to handle the responsibilities without any doubt. Therefore, I pose question to you "what did I do wrong to warrent [*sic*] your nonchallant [*sic*] attitude." For over two years I have been incarcerated I have not been getting money from anywhere, and business I was about to establish in Nigeria before my case started is now stranded for nonavailable funds to back it up [*sic*] Any moment from now, my kids may be ejected or facing foreclosure problem and I requested you to back up on [*sic*] regular basis payment of the mortgage until accounting statements of my legal fund in your custody is reconciled. Knowing full well the amount of my money

19

still in your possession will definitely take care of my mortgage without one problem.

'Prince, while I'm waiting patiently believing that you will as a Christian have enough time to rebuild what you intentionally did to me and my family, outside the scope of your practice as a lincense [*sic*] Attorney.

'I pray every day that Almighty God will guide and protect us, so as to end up the same way we started without a third-party intervention.

'Extend my sincere greetings to you beloved wife and children. Expecting to see you at Joe Corley Detention Facility soon. Thanks for your co-operation and understanding.'

The respondent, again, asserted that he did not receive this letter because U.I. 'made up' the letter.

"76.      On November 9, 2011, Tola Oresusi, an attorney retained by U.I. wrote to the respondent regarding their mutual client, U.I. The letter provided:

'I write with respect to our clients [U.I.] & Family, who have retained the undersigned law firm to prosecute their complaint and cause of action regarding the above referenced matter. This letter constitutes our clients' third written request and demand form [*sic*] you for an accounting and return of money transferred to you in trust by [U.I.] The total amount you are to account for is $1.95 million, US dollars. This is the last formal notice of complaint and demand for return of money pursuant to the Texas Deceptive Trade Practices Act. Please direct any and all communications, be they written or oral, about this matter to my attention. Please <u>do not</u> contact any of our clients, [U.I. and his] family.

'On numerous occasions, our clients have made attempts to resolve this matter with you but you have not been forthcoming, notwithstanding many promises made to fully refund the money left in trust with you.

20

'[U.I.] allegedly signed a contract with you but you have refused to give him a copy of that contract in violation of your ethical obligations. You also wrote bounced checks to the family from your IOLTA account, which in itself is a conduct unbecoming of any attorney licensed in any state in the union.

'The above complaint shows your breach of fiduciary duties to our clients. The complaint further constitutes misrepresentation, fraud and breach of the trust both at common law and under Texas Deceptive Trade Practices Act.

'Our clients wish to settle this matter amicably and request that you do the following:

> 1.      If you desire to resolve this matter, please contact this office within sixty (20) [*sic*] days of your receipt of this letter, so we might avoid unnecessary time, expense and additional attorney fees in litigating this matter.

> 2.      If this matter is unresolved within sixty (60) days form [*sic*] the date you receive this letter, our clients have instructed us to file a lawsuit against you. We shall have claims against you both at common law and under the Texas Deceptive Trade Practices Act. We shall seek the maximum damages allowed by law against you, plus attorney's fees and costs of court.

> 3.      Attorney's fees, for this type of case, could be very significant.

'It is the intention of our clients and this firm that no binding settlement exists until any proposal and acceptance are both (i) reduced to a written settlement agreement approved by all parties to the settlement, and (ii)

21

signed by all parties for which the settlement agreement contemplates signature, until all conditions or events requested by the settlement agreement are fully satisfied.

'Please contact the undersigned attorney at your earliest convenience so that we may discuss this matter. If I do not hear from you within the next sixty (20) [*sic*] days, I will assume that you do not wish to settle this matter out of court.'

"77. On November 14, 2011, the respondent sent Mr. Oresusi a message. The message provided:

'This is to advise you that I am in receipt of your letter dated 11-11-2011 wherein you are demanding for "return of money in trust" for [U.I.] family. According to your letter, you claimed that [U.I.] paid the sum of $1.95 million US dollars for his representation and wanted a return of said money.

'I decided to write to explain a little bit more so that you can have a better picture of the issues involved here. As I stated, your client may have misrepresented the actual amount he paid to our firm to you. Also, we are not denying the funds he paid to us but it is our contention that we do not owe your client any monies or that the funds he paid to us was for any trust accounts. Instead, our records show he signed a non refundable retainer contract of 3 million US dollars and did not even comply fully with the payment terms as agreed by both parties yet we completed the entire representation even though we lost. During your client's representation, we hired and paid other law firms large sums of money with the consent of your client to help in defending his matter. Our law firm lost so much money as we could not take other major cases due to the nature of your client's criminal charges. This case needed lots of attention and time involvement that my firm was basically shot [*sic*] down. We worked days, weekends, and nights. Your client clog [*sic*] our office and personal telephone lines with excessive calls from jail and

22

excessive demands for oversee [*sic*] telephone connections and discussions. We paid huge amounts in phone bills as a result. We deposited so much money into your client's jail accounts for his personal use as he requested and we gave so much money for your client's children' [*sic*] school fees, school housing and mortgages. I even co-signed the housing agreement for your client's daughter. Just about 2 weeks ago, I gave his son $10,000 to pay for your client's mortgages. I initially figured out that your client's case will be so involving [*sic*] that I explained this to him which he agreed to before he signed the non-refundable agreement. Counsel, I simply do not know where to start and where to end and I am glad I have so many witnesses ranging from attorneys, office staff, that will testify. And this representation went on for over TWO YEARS.

'Also, be aware that your client was convicted of 55 criminal count [*sic*] fraud indictment involving about $30 million dollars the government claimed he stole from medicare and medicaid. Your client was sentenced to about 27 years imprisonment as a result. It appears that US Government either has a lien or will have a lien on your client's recoverable property and has already garnished some of your client's assets. Therefore any settlement will be going to US government instead.

'Furthermore, It [*sic*] just came to my knowledge that your client still has major assets hidden in Nigeria which were acquired with portions of this money and I will encourage you as a lawyer and a Judge (as you claimed) to advise your client to disclose all these assets to the US government immediately. I have already advised his son to have his father disclose these assets to US government. Now I am glad you are his current lawyer and I know you will help in this. **I am willing to disclose the source of my information and to work with you to formally advise the US government about your client's hidden assets in Nigeria if you need my help.** He has banks or some financially [*sic*] institutions in Nigeria that may be part of this as well. Additionally, you have indicated you will file a lawsuit to recover the alleged funds (if

23

any), please when you do, make sure US government's interest is protected in the lawsuit as well because if the court determines there are still monies owed to your client, I will make payment arrangements with US governments and make sure the funds go to the US treasury as the rightful recipients of such funds.

'Your letter appear [*sic*] highly threatening and you made it worse when you further stated to me this morning over the phone that you are a Judge and has [*sic*] practiced for over 20 years and that I will see what you will do. I am taking this matter very serious as well and will refer this case to my defense team for handling if we could [*sic*] not resolve this amicably. However, if it is your intension [*sic*] for us to sit down and discuss this matter amicably and to find better [*sic*] solution in lieu of possible litigation, I am open to that and if you let me know, I will arrange a meeting. But contrary to your client's assertion, the money he paid was not for any trust. It is for legal fees which was non-refundable due to the nature of his case and the fees were earned. Also, he did receive a copy of the contract he signed with me. But if you decide for us to meet, I will give you another copy and also give you a run down account of the expenses.' (Emphasis added.)

"78.    Also on November 14, 2011, U.I. filed a complaint against the respondent with the disciplinary administrator.

"79.    On April 30, 2012, the respondent forwarded a written response to U.I.'s complaint. Included in the respondent's written response was a summary of services rendered as well as a summary of expenses. The respondent's written response to the complaint as well as the summary of services rendered and summary of expenses contains many false statements. *See* ¶ 157, below.

"80.    On May 8, 2012, the respondent forwarded a letter to Mr. Oresusi. In the letter, the respondent asserted that U.I. continued to owe the respondent 'a large sum of money.' The respondent attached the summary of services rendered and a summary of expenses to the letter to Mr. Oresusi.

24

"81.     On June 4, 2012, U.I. filed a petition against the respondent, alleging breach of contract, conversion, breach of fiduciary duties, misrepresentation, fraud, and deceptive trade practices in Harris County District Court, case number 2012-32324, for the respondent's failure to account for the monies paid by U.I. On May 14, 2013, the court granted the respondent's motion for summary judgment. On August 14, 2013, U.I. filed an appeal to the order granting the respondent summary judgment.

"82.     Thereafter, on February 13, 2014, and shortly before the disciplinary administrator and counsel for the respondent were scheduled to travel to South Carolina to take U.I.'s deposition while he was housed in FCI Estille, the respondent and U.I. entered a settlement and release agreement, which provided:

'THE SETTLEMENT AND RELEASE AGREEMENT is made by and between Mr. [U.I.] and Attorney Prince Uchechi Nwakanma (Attorney), whom collectively are referred to as PARTIES. This Agreement covers all claims and disputes, whether or no [*sic*] such claims are now pending or have not been asserted between the PARTIES arising from or related to Attorney's representation of [U.I.] in Case No: H-09-426, United States of America v [U.I.], which was pending in the United States District Court for the Southern District of Texas and was resolved by a judgment entered on October 21, 2013.

'[U.I.] as used herein refers to and includes his heirs, representatives, agents, and all individuals or entities who had or have standing to assert a claim on his behalf. Specifically, it includes his son [], to whom [U.I.] has granted a General Power of Attorney and his present attorney of record, Attorney Tola Oresusi.

'Attorney as used herein refers to and includes his heirs, his law firm, or any other entity owned by Attorney or in which Attorney has or may acquire an interest, and which may potentially be exposed to liability arising from or related to the subject matter of this Agreement.

25

'THE PARTIES REPRESENT AND AGREE AS FOLLOWS:

'1.     The PARTIES represent that they are adults, competent in all respects to enter this Agreement and do so, with the advice and consent of their respective independent counsel.

'2.     [U.I.] represents that the funds expended by him for his defense of the case against him in the U.S. District Court was a bank loan advanced to him.

'3.     [U.I.] has, subsequent to the judgment of the U.S. District Court for the Southern District of Texas, initiated a lawsuit against Attorney in Harris County, Texas. At the present time, [U.I.] is appealing a FINAL TRIAL COURT JUDGMENT in favor of Attorney, in connection with this lawsuit; 01-13-00699-CV.

'4.     [U.I.] also initiated a Disciplinary Complaint against Attorney with the State Bar of Kansas, which is presently pending, DA11,473.

'5.     Attorney does not admit any liability for any or all of the claims of [U.I.] in any fora.

'6.     The PARTIES have agreed to and now resolve any and every dispute within the scope of this Agreement on the following basis:

        a.      Attorney shall pay [U.I.] or his heirs, the sum of four hundred and twenty five thousand US dollars (US $ 425k) for the final, full, and complete settlement of all claims within the scope of this Agreement and this payment is to be utilized to repay portions of the bank loan(s) which was obtained for [U.I.]'s legal fees.

        b.      [U.I.] shall DISMISS with PREJUDICE his pending appeal in Texas, and shall send a letter to the

26

Kansas State Bar notifying the Bar that he has resolved all claims with Attorney, and shall no longer participate in any related proceeding. A sample of said letter shall be attached hereto and is herein incorporated by reference as part of this Agreement;

c.       The sequence of events related to the implementation of this Settlement Agreement shall be as follows:  Attorney shall purchase two bank drafts of $100K each made out in the name of Attorney Tola Oresusi and [U.I.'s son] as Agent in Fact of [U.I.]; and shall also issued [*sic*] checks payable to the same persons in amounts of not less than $10K for the balance of the $225K. The first check and subsequent checks shall be due and payable on the last day of the month following the date on which the Kansas Disciplinary Action is terminated, or the last day of the month after the State Bar of Kansas acknowledges [U.I.]'s intent to dismiss the Kansas Proceedings, whichever occurs first in time.

d.       [U.I.] and his agents shall prepare for filing a Motion to Abate in the Court of Appeals and a SIGNED COPY of the Kansas Dismissal Letter.

e.       All of the bank drafts, payment checks, Motion to Abate and Dismissal Letter shall be delivered to Mr. James Okorafor. Upon confirmation of the filing of the Motion to Abate in the Court of Appeals and mailing of the Dismissal Letter to Kansas, the first $100k draft shall be delivered to Attorney Tola Oresusi. Upon confirmation or receipt of a letter of Termination of the Kansas Proceedings or of [U.I.]'s Dismissal Letter of the Kansas Proceedings by the State Bar of Kansas, the

27

second $100k draft and ALL the payment checks shall be delivered to Attorney Tola Oresusi, who shall then file a Motion to Dismiss with Prejudice any [*sic*] Court of Appeals, Houston, Texas.

f.      In the event, the State Bar of Kansas proceeds with the Disciplinary Complaint after its receipt and acknowledgment of [U.I.]'s Dismissal Letter, [U.I.] and\or his representatives shall give attorney a sworn statement attesting to the fact that Attorney does NOT owe [U.I.] any money in relating to the complaint and that [U.I.] does not expect any restitution to be paid to him.

g.      Attorney also agrees to help [U.I.] and his family to recover an over payment of $75k in attorney's fees to Attorney Dick Deguerin of Houston, Texas by providing a sworn statement to [U.I.] confirming the amount Attorney Dick Deguerin promised to charge [U.I.] if he himself tried the case as against if an associates [*sic*] of his tried the case.

'7.     Attorney agrees that as liquidated damage for any check(s) not negotiable on the due date, he shall pay an additional $25.00 per day, until fully paid.

'8.     [U.I.] agrees to indemnify, defend, and hold harmless Attorney for any and all losses, claims, demands, causes of action, and any judgments, fees, expenses, cost of any nature whatsoever paid and incurred as a result of or arising within the scope of this Agreement.

'9.     The PARTIES agree and understand that this Agreement constitutes a FINAL and complete settlement, release, payment in full, and accord and satisfaction of all claims within the scope of this

Agreement, and that they have relied on the material representations herein as part of the consideration and inducement for this settlement.

'10.     The Parties agree that the existence and terms of this Agreement shall be kept confidential and may not be disclosed to any third parties, unless compelled by ORDER of Court, or sought to be enforced against a breaching party. The PARTIES further agree that in case of breach by any party, the NON breaching party shall be entitled to a recovery of attorney fees and all costs expended in the enforcement of this Agreement.

'11.     The PARTIES agree that this represents the complete agreement between them and that this agreement may be amended only by a written instrument executed by the PARTIES or their duly authorized agent(s).

'12.     THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF TEXAS and all disputes relating to or arising from this agreement shall be resolved by ADR or by litigation, exclusively in Harris County, Texas.'

"83.     On February 19, 2014, Mr. Oresusi sent the disciplinary administrator a letter which stated that U.I. no longer wished to proceed with the complaint. Additionally, Mr. Oresusi provided the disciplinary administrator with a second letter signed by U.I. and by Mr. Oresusi which provided:

'Please kindly be hereby informed that I have satisfactorily resolved all matters related to or arising from the above referenced complaint against Attorney Uchech [*sic*] O. Nwakanma and Prince & Associates. At this time, there no longer exists any dispute or controversy between us which requires your time, attention and resources. The above referenced complaint was brought as a result of miscommunication and misunderstanding which as earlier stated herein has been completely and satisfactorily resolved.

29

'Therefore, please kindly accept this as formal notice that effective as the date of this letter, I have irrevocably withdrawn and terminated the above referenced complaint and also requesting that all proceedings related to or arising from the said complaint as instituted by the Kansas Disciplinary Administration which is now pending, be terminated. I shall no longer participate in any proceeding of any type related to this moot complaint [*sic*]

'I would very much appreciate a written response to acknowledge the withdrawal and termination of my above referenced complaint.'

"84.      On February 28, 2014, the disciplinary administrator wrote to Mr. Oresusi, informing him that he did not intend to dismiss U.I.'s complaint against the respondent.

"85.      On March 19, 2014, Mr. Oresusi filed a motion to dismiss the pending appeal of the Texas state court action. In the motion, the parties stated:  'The Parties have reached a settlement agreement in this case. All issues were resolved. As a result, both parties request this case be dismissed from the docket of this Court.' On April 3, 2014, the court dismissed the pending appeal.

"86.      On March 13, 2015, Mr. Oresusi sent Mr. Weir a letter which stated:

'On February 19, 2014, I related to Mr. Stanton A. Hazlett of the Kansas Bar Office of Disciplinary Administrator our client's position with a signed letter from [U.I.]. [U.I.] told me then that he was no longer interested because he was satisfied with the resolution of the case. As such, he also dismissed the civil appeal that was pending. [U.I.] was not under the impression that he was barred from going forward with the Kansas bar proceeding but elected to move on with his life. Any impression to the contrary will be misplaced.'

Mr. Oresusi's letter is contrary to clear language of the settlement and release agreement where U.I. agreed to 'send a letter to the Kansas State Bar notifying the Bar that he has

resolved all claims with Attorney, and shall no longer participate in any related proceeding.'

"87.    At the hearing on this matter, the respondent testified that he paid U.I. only part of the settlement amount. On January 27, 2016, Mr. Oresusi wrote to the disciplinary administrator and stated that U.I. was again willing to testify in the disciplinary hearing pending against the respondent.

"DA12275—Representation of J.Z.

"88.    In 1987, J.Z., an immigrant from Mexico, obtained lawful permanent resident status. Later, J.Z. was convicted of driving under the influence of alcohol three times, the third conviction being a felony. In 2000, the Immigration and Naturalization Service ordered J.Z. removed from the United States after it concluded that J.Z.'s felony conviction for driving under the influence of alcohol constituted an aggravated felony. J.Z. was deported to Mexico. Subsequently, J.Z. returned to the United States illegally.

"89.    In 2001, the United States Court of Appeals for the Fifth Circuit held that a felony conviction for driving under the influence of alcohol was not an aggravated felony and is not grounds for deportation. *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001).

"90.    In 2008, J.Z. heard an advertisement on the radio for the respondent's practice. The respondent's advertisement stated that the respondent could provide assistance to immigrants who had been convicted of felony driving under the influence of alcohol and subsequently deported. Because of the advertisement, J.Z. contacted the respondent.

"91.    J.Z. and R.Z. (J.Z.'s wife) scheduled an appointment with the respondent. During the initial consultation, on July 24, 2008, the respondent informed J.Z. and R.Z. that there was a court case which held that a felony conviction for driving under the influence of alcohol was not an aggravated felony and, as a result, not a conviction which could result in removal. The respondent assured J.Z. that the respondent would be able to get J.Z. his green card back in a few months. The respondent contended that he never

31

represented J.Z. Based on all the testimony presented, the hearing panel concludes that the respondent's assertions in this regard lack merit.

"92. The respondent charged J.Z. a $6,000 fee. The respondent promised to start working on J.Z.'s immigration case as soon as J.Z. paid one-half of the agreed fee. The day of the initial consultation, J.Z. paid the respondent $1,000 by check and $2,000 by credit card.

"93. That day, the respondent's office provided J.Z. with a letter of representation. The letter of representation was simply a letter stating that J.Z. was represented by counsel and that any and all inquiries regarding J.Z. should be made to J.Z.'s counsel. The letter had no legal significance. The respondent instructed J.Z. to show the letter to any law enforcement officers who stopped him.

"94. Also, that day, the respondent had J.Z. sign an I-212. J.Z. paid the respondent $545 for the filing fee associated with filing an I-212 application. Despite directing J.Z. to sign the I-212, there was no evidence presented to establish that the respondent filed the I-212 on behalf of J.Z. or took any other action on behalf of J.Z. to restore his permanent lawful resident status.

"95. From time to time, J.Z. attempted to contact the respondent regarding the status of his immigration case. The respondent did not return J.Z.'s telephone calls. The only time the respondent's office contacted J.Z. was to remind J.Z. that a payment was due.

"96. By the fall of 2010, J.Z. had paid the balance of the agreed fee. About that time J.Z.'s commercial driver's license was set to expire. J.Z. retained the respondent to assist him in renewing his driver's license. J.Z. and the respondent agreed to an additional fee of $1,500. J.Z. agreed to pay one-half of the fee initially and the remainder of the fee after his commercial driver's license was renewed. J.Z. paid the respondent $750. The respondent attempted to renew J.Z.'s driver's license online. When the respondent's attempt to renew J.Z.'s driver's license online was unsuccessful, the respondent directed one of the associate attorneys in his office to accompany J.Z. to the driver's license office to renew the driver's license.

32

"97.    J.Z. and a female associate attorney in the respondent's office went to the driver's license office. The clerk at the driver's license office asked J.Z. for a copy of his green card. J.Z. looked to the associate attorney for assistance. The associate attorney told J.Z. to tell the clerk that he was a United States' citizen. J.Z. did not tell the clerk that he was a United States citizen. Rather, J.Z. left the driver's license office.

"98.    A few days later, J.Z. returned to the respondent's office and told the respondent what the associate attorney told him to say. The respondent replied that the associate attorney had been terminated and the respondent promised to refund the $750 paid. The respondent failed to refund the fee.

"99.    J.Z. concluded that he needed to seek other counsel. J.Z. requested that the respondent provide an accounting of the fee and a refund for the unearned fees. The respondent did not provide an accounting of the fee. At some point, the respondent offered to refund a portion of the fee. Because the respondent did nothing to assist J.Z. and because the respondent had failed to provide an accounting of the fee, J.Z. believed that the respondent should refund the entire fee.

"100.    R.Z. requested that the respondent provide J.Z. with a copy of the papers that J.Z. signed during their initial meeting. When R.Z. went to pick up the copy of the papers, the respondent's staff provided R.Z. with an envelope. Inside the envelope was just a copy of the receipts establishing many of the payments made by J.Z. and R.Z.

"101.    In 2014, J.Z. hired Raed Gonzalez to assist him with this immigration case. In February, 2014, Mr. Gonzalez filed a motion to reopen J.Z.'s removal proceedings with the Board of Immigration Appeals. Initially, on April 7, 2014, the Board of Immigration Appeals denied the motion. Thereafter, Mr. Gonzalez filed a petition for review with the United States Court of Appeals for the Fifth Circuit and filed a motion for reconsideration with the Board of Immigration Appeals. On September 4, 2014, the Board of Immigration Appeals granted the motion for reconsideration, reopened J.Z.'s case, and held that J.Z.'s felony conviction for driving under the influence of alcohol was not an aggravated felony. The Board of Immigration Appeals terminated the removal proceedings and restored J.Z.'s green card. Since that time, J.Z. has become a United States citizen.

"102.    Further, during Mr. Gonzalez' representation of J.Z., Mr. Gonzalez found no evidence that the respondent had done any work to restore J.Z.'s lawful permanent resident status. The respondent did not file a motion to reopen the removal proceedings nor did the respondent file the I-212 application that J.Z. had signed. Mr. Gonzalez checked with the court, the Department of Homeland Security Office of Immigration and Customs Enforcement, and the United States Citizenship and Immigration Services and concluded that the respondent did not file anything on behalf of J.Z.

"103.    At the hearing on this matter, Mr. Gonzalez testified that filing an I-212 would not provide the relief that J.Z. sought. The I-212 application would have required that J.Z. wait 20 years to re-enter the country.

"Tax Liens

"104.    *Tax Liens*. The Department of the Treasury, Internal Revenue Service has filed and recorded three notices of tax liens against the respondent.

    'a.    On August 18, 2013, a notice of federal tax lien was filed and recorded against the respondent and his wife regarding tax years 2005, 2006, 2008, 2009, 2010, and 2011, in the total amount of $767,768.22.

    'b.    On September 15, 2014, a notice of federal tax lien was filed and recorded against Royal Dialysis Center, LLC and the respondent as member for tax year 2012 in the amount of $13,104.67.

    'c.    On May 18, 2015, a notice of federal tax lien was filed and recorded against the respondent and his wife regarding tax years 2012 and 2013 in the total amount of $22,362.94.

"105.    The tax liens remain unpaid.

"Failure to Provide Tax Returns

"106.    On January 31, 2014, the disciplinary administrator directed the respondent to provide the 'federal and state corporate tax returns (including Texas Franchise Tax reports) with all schedules and forms, that were filed by Prince & Associates, P.C. for tax years 2008-2012' by March 1, 2014. The respondent failed to provide the requested tax returns, schedules, and forms by March 1, 2014.

"107.    On April 11, 2014, the disciplinary administrator sent counsel for the respondent a second letter directing the respondent to provide the tax returns, schedules, and forms, as well and many other documents by May 1, 2014. The respondent provided the tax return for 2009. The respondent failed to provide the remaining tax returns, schedules, and forms. On July 21, 2014, the disciplinary administrator again requested the outstanding tax returns, schedules, and forms. The disciplinary administrator directed the respondent to forward the records within 20 days. The respondent failed to provide the requested tax returns, schedules, and forms within 20 days. On August 11, 2014, counsel for the respondent requested an additional 2 weeks to provide the requested tax returns, schedules, and forms.

"108.    On September 30, 2014, the disciplinary administrator filed a motion to compel, seeking information concerning the settlement between the respondent and the complainant and the respondent's corporate income tax returns for 2010, 2011, and 2012. On October 14, 2014, the respondent filed a motion for an extension of time to respond to the disciplinary administrator's motion to compel. Thereafter, on October 24, 2014, the respondent filed a reply to the disciplinary administrator's motion to compel. On December 22, 2014, the hearing panel entered an order granting the disciplinary administrator's motion to compel.

"109.    On June 7, 2016, the disciplinary administrator filed a motion to compel, again seeking corporate tax returns, with all forms and schedules for 2008 and 2012. The respondent did not file a response to the disciplinary administrator's motion. On June 27, 2016, in an order on prehearing motions, the hearing panel granted the disciplinary administrator's motion to compel. On July 13, 2016, the respondent filed a pleading titled, in part, 'Evidence of Respondent's compliance to [*sic*] ORDER to compel release of tax

35

records.' In that pleading, the respondent argued that because he was unable to find the requested documents and because he filed a 'Request for Transcript of tax Return,' executed in favor of the disciplinary administrator, he hoped the issue was resolved. On July 19, 2016, the hearing panel entered a second order on prehearing motions. In the order, the hearing panel concluded that the respondent failed to comply with the order to compel. The hearing panel again ordered the respondent to provide the tax returns, schedules, and forms. On July 22, 2016, the respondent filed a notice regarding the order to compel. In the notice, the respondent asserted that he had previously provided the 2012 corporate tax return.

"110.    At the outset of the hearing, the hearing panel took up the matter of the order to compel. The hearing panel found that the respondent had not provided the 2008 corporate tax returns and schedules or the 2012 corporate tax schedules. The hearing panel provided the respondent with 2 additional days to produce the returns, schedules, and forms. On Wednesday, July 27, 2016, the respondent provided the tax returns, schedules, and forms which an accountant apparently prepared during the first days of the disciplinary hearing. While the respondent stated that the tax returns, schedules, and forms were filed, there is no evidence in the record to support his claim.

"DA12030—The Respondent's Trust Account

"111.    On January 31, 2014, the disciplinary administrator requested that the respondent provide his attorney trust account records for the time period spanning July 1, 2009, through December 31, 2011.

"112.    The respondent provided attorney trust account records for an account registered in the name of Uchechi Nwakanma *db*a Prince & Associates held with the JP Morgan Chase Bank. Because the respondent opened the account on August 24, 2009, the respondent provided records which covered August 24, 2009, through December 31, 2011. Additionally, the respondent believed that 'he had a previous account at Compass Bank, but since he rarely uses a trust account in his type of business, he had closed that account.' The respondent did not identify the dates the Compass Bank attorney trust account was open. Further, at the hearing on this matter, the respondent testified that he had a third attorney trust account. The respondent failed to explain why he did not earlier

36

disclose the existence of the third trust account nor why he did not provide records as requested by the disciplinary administrator.

"113.   The respondent's attorney trust account records were simply bank records. The respondent did not have a receipts journal, a disbursements journal, an individual trust account ledger for each client whose funds were placed into the trust account, nor did the respondent have records of periodic reconciliations.

"114.   From the evidence presented, specifically the respondent's testimony, it is clear that the respondent does not understand how to properly use an attorney trust account.

'Q.     Last check is written on your trust account, why was that $5,000 check written on your trust account?

'A.     The money in the trust account was my money. I use that, you know, to write. So it didn't really matter where the money came from, they were all my funds.

'Q.     So the money in the trust account for which you paid—from which you paid the $5,000 was your own personal money?

'A.     Of course.

'Q.     I'm sorry?

'A.     Yes. Yes.

'Q.     You think it was appropriate to put your own personal money into your trust account to pay [U.I.]?

'A.     You know, because of this trial we were the—the manager will tell you that I needed to do, if I do not do that, that account is closed because I—

37

. . . .

'A.     Let me give you a little history, sir. I do not practice cases that you receive settlements. I didn't do personal injury cases. I didn't do those cases that I receive settlements for clients. What I do just purely flat fee cases, earned immediately. So in order for me to keep—since it is a requirement for a lawyer to maintain a trust account, so for me to keep it open and active so that it is not being closed by the bank, I have to show some activity so I have to put my funds in there and I wrote checks. And the bank manager, because of this—before the end of this trial will also testify to that in order for me to keep that account open I have to show some activity, otherwise that is closed. And if it's closed I'm in violation, so that was why I put my funds in there. And I explained this to you that's why in the past.

. . . .

'Q.     Do you understand the rule prohibits you from keeping your own money in the trust account either after it's earned, that you just cannot deposit it?

'A.     I do not, because the purpose of the trust account—the purpose of the trust account is to maintain—is to, you know, keep safe client's funds. If you don't have no client's funds in your trust account, you can use the funds. That's my own belief.

'Q.     So your explanation is your understanding of the rule is you can place your own money in your trust account, you can keep it in there, you can pay it out for office expenses or whatever expense that you deem appropriate, is that a fair statement?

'A.     That's my—as long as clients had not—funds are not in that trust account, so long as there's no commingling with your personal funds with client funds.

38

'Q.     And in November of 2009 you put $552,000 of your own money into your trust account?

'A.     In November—I sold—in January of 2009 I sold my business, one of my businesses for $600,000.

'Q.     What business was that?

'A.     Sigmah Home Health Services, Inc., to Patrick Finn, that's why you can refer. So he paid me cash $600,000.

'Q.     He paid you cash?

'A.     Yes.

'Q.     $600,000 in cash?

'A.     No, I'm talking about, you know, the money was not like financed. He purchased the business and paid me money for $600,000. It had 550,000 or between 550,000 to 600,000 cash he paid me 2006—I mean, in 2009.

'Q.     Was it cash or not?

'A.     What I mean by cash is I did not finance it. He paid everything completely the same time.

'Q.     So—and it was for the sale of what business?

'A.     That was Sigmah Home Health Services, Inc.

'Q.     So totally unrelated to your law practice?

'A.     I'm sorry?

39

'Q.     That business was totally unrelated to your law practice?

'A.     Yes.

'Q.     And yet you put the proceeds from that sale into your trust account?

'A.     That's my money. I was just—I put it in that account to use, yes.

'Q.     Why in your trust account and not any other account that you had, because you apparently had a number of other accounts?

'A.     Well, at that very point in time my—my knowledge was not— what I believed at that time is that unless that's client's funds in those accounts, in the IOLTA account, you cannot commingle. I was not of the opinion that I can't put my money in those accounts and run expenses through them. I was not of other opinion, but I knew that if I had client's money that were not mine, at that very point in time I could not put my funds in that account. That was my notion. That may have changed. I mean, that may have changed. Maybe that was the wrong practice of yesterday, but that may have changed now. So that was my frame of mind at that very point in time.

'Q.     Well, you understand that a trust account is basically for client money, not for your money?

'A.     To protect client's money.

'Q.     Correct. You understand that your money from a totally unrelated business—sale of an unrelated business should not go into your trust account?

'A. I did not understand that. What I now believe is that the trust account is meant to protect client's money, and if you don't have no client's money there, that's your account, more or less.'

"115. Because of the respondent's failure to maintain properly attorney trust account records, the respondent did not know how much money he had received from U.I.

"116. Throughout the relevant time period, the respondent improperly utilized his attorney trust account.

a. According to the records provided by the respondent, the respondent regularly kept his personal funds in his attorney trust account. Despite the respondent's statements to the contrary, the respondent kept client funds in his attorney trust account. On nearly 50 occasions, the respondent paid filing fees, on behalf of clients, using his attorney trust account. Because the money used to pay the filing fees was clearly client money, the hearing panel finds that the respondent deposited client funds in his attorney trust account. Additionally, as described in paragraph (g) below, the respondent deposited settlement proceeds into his attorney trust account. Thus, because the respondent kept personal funds in this attorney trust account and because he deposited client funds in this attorney trust account, the respondent commingled his funds with those of his client.

b. In 2010, the respondent made four deposits into his attorney trust account which were identified as loans from Anstech Ventures, Inc., a company that the respondent formed in November, 2009.

c. Between August 24, 2009, and December 31, 2011, the respondent loaned $14,000 of funds from his attorney trust account to another business owned by the respondent, Allstate Dialysis.

41

d. Throughout the time period covered by the records provided by the respondent, the respondent regularly paid personal and professional expenses directly from his attorney trust account. The respondent issued payroll checks for his law firm's employees from his attorney trust account.

e. Between August 24, 2009, and December 31, 2011, the respondent's attorney trust account was overdrawn on more than 30 days.

f. The respondent regularly made cash deposits and cash withdrawals from his attorney trust account. The respondent failed to properly document the source of the cash deposits and the respondent failed to properly document the purpose of the cash withdrawals.

g. In 2010, the respondent received settlement proceeds on behalf of his client J.L. The respondent deposited the settlement proceeds into his attorney trust account.

h. Through all of the above, the respondent used his trust account to repeatedly commingle his personal funds with his firm operating funds, his clients' funds, and the funds of his businesses.

i. Finally, the respondent failed to properly maintain records of his attorney trust account.

"DA12247, DA12275, DA12303, DA12311, DA12390, DA12443

"117. In the formal complaint, the disciplinary administrator alleged that the respondent failed to provide a written response to the initial complaints in DA12247, DA12275, DA12303, DA12311, DA12390, and DA12443. The disciplinary administrator stated that because the respondent eventually filed responses in these six cases, the disciplinary administrator was abandoning the allegations that the respondent failed to respond to the initial complaints. Accordingly, the hearing panel dismisses the allegations that the respondent failed to provide a written response in DA12247,

42

DA12275, DA12303, DA12311, DA12390, and DA12443. It should be noted, that DA12275 relates to the respondent's representation of J.Z. The disciplinary administrator did not abandon the other allegations made in that case, as described in ¶¶ 88-103 above.

"*Conclusions of Law*

"118.    Given the respondent's unique circumstances, practicing immigration law in Houston, Texas, by virtue of his Kansas license, the parties briefed the question of choice of law. The parties agreed that many of the rules regulating the practice of law in Texas are similar to the rules in Kansas. The parties further agreed that Texas law applies in this case.

"119.    However, because the respondent possesses a Kansas license, the hearing panel has analyzed both Kansas and Texas rules as they relate to the respondent's misconduct. Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated the following Texas Disciplinary Rules of Professional Conduct:  Rule 1.01 (competence and diligence), Rule 1.03 (communication), 1.04 (fees), 1.14 (safekeeping property), 1.15 (declining or terminating representation), 3.04 (fairness in adjudicatory proceedings), 8.01 (bar admission, reinstatement, and disciplinary matters), and 8.04 (misconduct) and the following Kansas Rules of Professional Conduct: KRPC 1.1 (competence), KRPC 1.3, (diligence), KRPC 1.4 (communication), KRPC 1.5 (fees), KRPC 1.15 (safekeeping of property), KRPC 1.16 (termination of representation), KRPC 8.1 (bar admission and disciplinary matters), KRPC 8.4 (misconduct), and Kan. Sup. Ct. R. 207 (cooperation), as detailed below.

"120.    The hearing panel concludes that the evidence did not establish a violation of Texas Disciplinary Rule of Professional Conduct 1.05 (confidentiality of information) and KRPC 1.6 (confidentiality of information) by clear and convincing evidence.

"Competence and Diligence

"121.    Lawyers must provide competent and diligent representation to their clients. Texas Disciplinary Rule of Professional Conduct 1.01 provides:

'(a)    A lawyer shall not accept or continue employment in a legal matter which the lawyer knows or should know is beyond the lawyer's competence, unless:

>    (1)    another lawyer who is competent to handle the matter is, with the prior informed consent of the client, associated in the matter; or

>    (2)    the advice or assistance of the lawyer is reasonably required in an emergency and the lawyer limits the advice and assistance to that which is reasonably necessary in the circumstances.

'(b)    In representing a client, a lawyer shall not:

>    (1)    neglect a legal matter entrusted to the lawyer; or

>    (2)    frequently fail to carry out completely the obligations that the lawyer owes to a client or clients.

'(c)    As used in this Rule, "neglect" signifies inattentiveness involving a conscious disregard for the responsibilities owed to a client or clients.'

In applying the Texas rule to the facts at hand, the respondent should have known that he was not competent to represent J.Z. The goal of the representation was to restore J.Z.'s permanent resident status. The respondent had J.Z. sign an I-212. Had the respondent filed the I-212, the respondent could have caused J.Z. to be ineligible to be lawfully

44

present in the United States for 20 years. Accordingly, the hearing panel concludes that the respondent violated Texas Rule 1.01(a).

"122.    KRPC 1.1 (competence) provides:  'A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The respondent's representation of J.Z., as described in ¶ 121, above, also violated KRPC 1.1. Thus, the hearing panel concludes that the respondent violated KRPC 1.1.

"123.    In addition to violating Texas Rule 1.01(a), the respondent also violated Texas Rule 1.01(b) for failing to diligently and promptly represent J.Z. The respondent failed to take any action to restore J.Z.'s permanent resident status. The respondent's neglect of the matter entrusted to him caused J.Z. years of anguish. Because the respondent neglected a legal matter entrusted to him for a period of years, the hearing panel concludes that the respondent violated Texas Rule 1.01(b).

"124.    In Kansas, the diligence rule provides:  'A lawyer shall act with reasonable diligence and promptness in representing a client.' The respondent failed to act with reasonable diligence and promptness in representing J.Z. As such, the hearing panel concludes that the respondent violated KRPC 1.3.

"Communication

"125.    Texas Rule 1.03(a) and KRPC 1.4(a) provide that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the respondent violated Texas Rule 1.03(a) and KRPC 1.4(a) when he failed to respond to U.I.'s letters and when he failed to respond to J.Z.'s telephone calls. Accordingly, the hearing panel concludes that the respondent violated Texas Rule 1.03(a) and KRPC 1.4(a).

"Fees

"126.    Texas Rule 1.04 provides:

45

'(a)     A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.

'(b)     Factors that may be considered in determining the reasonableness of a fee include, but not to the exclusion of other relevant factors, the following:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.'

46

KRPC 1.5(a) is remarkably similar to Texas Rule 1.04(b). The only difference between the two rules can be found in the two subsections numbered (8). The difference between the two subsections numbered (8) is not relevant to our discussion.

"127.    The hearing panel considered all 8 factors as detailed below:

'a.        The respondent presented evidence that he spent a great deal of time working on U.I.'s case. However, much of what the respondent did for U.I. was not included in the scope of the work undertaken pursuant to the written fee agreement.

'b.        The hearing panel agrees with the respondent that he was unable to accept some cases because of the time he spent representing U.I. The evidence also showed, however, that the respondent spent significant time representing other clients and working on his other businesses. While the respondent testified that his other business interests suffered as a result of his representation of U.I., the hearing panel concludes that the respondent's testimony in this regard lacks merit.

'c.        The fee customarily charged in the locality for similar legal services was clearly established by the evidence in this case. Mr. Martinez charged $40,000. Mr. Deguerin charged $250,000. Mr. Fisch, likewise, charged $250,000. The hearing panel concludes that the fee customarily charged in the locality for similar legal services for an experienced attorney would be no more than $250,000, excluding expenses.

'd.        The factor regarding the amount involved and the results obtained is difficult to apply in this case. It was certainly a significant case, involving 55 felony criminal counts. The results obtained in this case, convictions of 48 felony charges, were certainly not what U.I. was seeking.

47

'e.     The time limitations imposed in this case were based upon the nature of the case, that being a federal criminal case.

'f.     It is unclear from the record, whether the respondent had previously represented U.I. in an immigration matter or not. Regardless, even if the respondent had previously represented U.I. this factor is not significant in determining whether or not the $3,000,000 fee was reasonable.

'g.     The respondent was inexperienced in the practice of law as it relates to the type of representation. The respondent had not previously represented a criminal defendant in the Medicaid or Medicare fraud case. The respondent had never tried any case to the jury. On his own, the respondent was incompetent to handle the representation. Moreover, the respondent provided no evidence that the experience that he did have would translate to sufficient skill to represent U.I. or warrant a $2,000,000 or $3,000,000 fee.

'h.     The fee in this case was a fixed fee in the amount of $3,000,000.'

"128.    After carefully considering all of the factors listed above, the hearing panel concludes that the respondent violated Texas Rule 1.04(b) and KRPC 1.5 by charging U.I. an unreasonable fee.

"129.    An analysis of Texas Rule 1.04 and KRPC 1.5 as it relates to the fee the respondent charged to represent J.Z. is also warranted. The respondent received the fees J.Z. paid beginning in 2008. Further, because the respondent took no action to restore J.Z.'s permanent resident status, the fee charged by the respondent, or any fee, was unreasonable. As such, the hearing panel concludes that the respondent also violated Texas Rule 1.04 and KRPC 1.5 with regard to the fee charged to J.Z.

"Safekeeping Property

"130.    Lawyers must keep the property of their clients safe. The Texas rule regarding safekeeping property is Texas Rule 1.14. That rule provides:

'(a)    A lawyer shall hold funds and other property belonging in whole or in part to clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own property. Such funds shall be kept in a separate account, designated as a "trust" or "escrow" account, maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other client property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

'(b)    Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

'(c)    When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separated by the lawyer until the dispute is resolved, and the undisputed portion shall be distributed appropriately.'

49

KRPC 1.15 is Kansas' safekeeping property rule. The Kansas rule is a bit more complicated than the Texas rule. Subsections (a) and (b) are identical in the two rules. Subsection (c) in the Texas Rule has additional language which the Kansas counterpart does not possess:

> '(c)     When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.'

KRPC 1.15(c). Additionally, the Kansas rule has additional subsections. For purposes of this case, the hearing panel will consider only subsections (a), (b), and (c) of the Kansas rule. The respondent violated the safekeeping property rules in a number of ways.

"131.    First, the respondent violated Texas Rule 1.14(a) and KRPC 1.15(a) by commingling his funds with those of his client. The respondent routinely deposited personal funds into his attorney trust account. Further, on nearly 50 occasions, the respondent paid filing fees on behalf of clients out of the attorney trust account. Filing fees are not funds belonging to the respondent, rather they are funds belonging to the client. Because the respondent deposited his personal funds into his client trust account which contained client funds, the respondent commingled his funds with those of his client, in violation of Texas Rule 1.14(a) and KRPC 1.15(a).

"132.    Second, the respondent was required to keep complete records of his attorney trust account for a period of 5 years after the completion of the representation of U.I. Texas Rule 1.14(a) and KRPC 1.15(a). The respondent failed to do so. The respondent did not maintain complete records of his attorney trust accounts. Therefore, the hearing panel concludes that the respondent violated Texas Rule 1.14(a) and KRPC 1.15(a).

"133.   Third, the respondent at least twice violated Texas Rule 1.14(b) and KRPC 1.15(b) by failing to return the unearned fees to U.I. and also by failing to return the unearned fees to J.Z.

"134.   Fourth, the respondent violated Texas Rule 1.14(b) and KRPC 1.15(b) by failing to 'promptly render a full accounting' to U.I. and to J.Z.

"135.   Finally, the respondent violated Texas Rule 1.14(c) and KRPC 1.15(c) when he failed to keep the portion of the fees in dispute separate until the dispute was resolved with regard to both U.I. and J.Z.

"Declining or Terminating Representation

"136.   Texas Disciplinary Rule of Professional Conduct 1.15 and KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, Texas Rule 1.15(d) provides:

'(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.'

And, KRPC 1.16(d) provides:

'(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The

51

lawyer may retain papers relating to the client to the extent permitted by other law.'

Thus, the only difference between Texas Rule 1.15(d) and KRPC 1.16(d) is when a lawyer may retain papers relating to clients. When a lawyer may retain papers relating to clients is not at issue in this case. As such, the difference between the two rules is not relevant to our discussion.

"137. The respondent violated Texas Rule 1.15(d) and KRPC 1.16(d) when he failed to refund unearned advanced fees to U.I. and J.Z. The hearing panel concludes that the respondent violated Texas Rule 1.15(d) and KRPC 1.16(d).

"Fairness in Adjudicatory Proceedings

"138. The rules of professional conduct require lawyers to treat opposing counsel with fairness. Texas Rule 3.04 provides, in pertinent part, as follows:

"[]A lawyer shall not:

'(e)     request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1)     the person is a relative or an employee or other agent of a client; and

(2)     the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.'

The Kansas rule bears a different name, 'Fairness to Opposing Party and Counsel,' however the relevant provision, KRPC 3.4(f), is identical to Texas Rule 3.04(e).

"140. When the respondent settled the civil suit which U.I. filed against him, the settlement agreement signed by the respondent and U.I. provided, in part, as follows:

'b.     [U.I.] shall DISMISS with PREJUDICE his pending appeal in Texas, and shall send a letter to the Kansas State Bar notifying the Bar that he has resolved all claims with Attorney, and shall no longer participate in any related proceeding. A sample of said letter shall be attached hereto and is herein incorporated by reference as part of this Agreement.'

Because the respondent requested U.I. *via* the settlement agreement to refrain from voluntarily giving relevant information in the disciplinary proceedings, the hearing panel concludes that the respondent violated Texas Rule 3.04 and KRPC 3.4(f). *See In re Walsh*, 286 Kan. 235, 252 (2008) and *In re Romious*, 291 Kan. 300 (2010).

"Cooperation

"141.   In a disciplinary matter, an attorney must cooperate with the disciplinary investigation and must provide honest and accurate information to the authorities conducting the disciplinary investigation. Texas Rule 8.01 and KRPC 8.1 provide:

'An applicant for admission to the bar, a petitioner for reinstatement to the bar, or a lawyer in connection with a bar admission application, a petition for reinstatement, or a disciplinary matter, shall not:

(a)     knowingly make a false statement of material fact; or

(b)     fail to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admission, reinstatement, or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.05.'

In this case, the respondent violated both subsection (a) and subsection (b). First, the respondent included false statements of material facts in his written response to the initial

53

complaint. *See* ¶ 157, below. Second, the respondent failed to provide the tax returns, schedules, and forms as requested and ordered for years. *See* ¶¶ 106-110, above. Then, when the respondent ultimately provided the tax returns, schedules, and forms on the third day of the hearing on the formal complaint, the respondent failed to clearly establish when or if the tax returns, schedules, and forms had been filed with the Internal Revenue Service. The hearing panel, therefore, concludes that the respondent violated Texas Rule 8.01(a), Texas Rule 8.01(b), KRPC 8.1(a), and KRPC 8.1(b).

"Misconduct

"142.    Texas Disciplinary Rule of Professional Conduct 8.04 is substantially similar to KRPC 8.4. However, the Texas rule is structured differently than the Kansas rule and the Texas rule contains additional subsections. The Texas rule, in its entirety, provides as follows:

'(a)    A lawyer shall not:

(1)    violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

(2)    commit a serious crime or commit any other criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(3)    engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(4)    engage in conduct constituting obstruction of justice;

54

(5)     state or imply an ability to influence improperly a government agency or official;

(6)     knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law;

(7)     violate any disciplinary or disability order or judgment;

(8)     fail to timely furnish to the Chief Disciplinary Counsel's office or a district grievance committee a response or other information as required by the Texas Rules of Disciplinary Procedure, unless he or she in good faith timely asserts a privilege or other legal ground for failure to do so;

(9)     engage in conduct that constitutes barratry as defined by the law of this state;

(10)    fail to comply with section 13.01 of the Texas Rules of Disciplinary Procedure relating to notification of an attorney's cessation of practice;

(11)    engage in the practice of law when the lawyer is on inactive status or when the lawyer's right to practice has been suspended or terminated including but not limited to situations where a lawyer's right to practice has been administratively suspended for failure to timely pay required fees or assessments or for failure to comply with Article XII of the State Bar Rules relating to Mandatory Continuing Legal Education; or

(12)     violate any other laws of this state relating to the professional conduct of lawyers and to the practice of law.

'(b)     As used in subsection (a)(2) of this Rule, "serious crime" means barratry; any felony involving moral turpitude; any misdemeanor involving theft, embezzlement, or fraudulent or reckless misappropriation of money or other property; or any attempt, conspiracy, or solicitation of another to commit any of the foregoing crimes.'

KRPC 8.4 provides:

'It is professional misconduct for a lawyer to:

'(a)     Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

'(b)     commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

'(c)     engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

'(d)     engage in conduct that is prejudicial to the administration of justice;

'(e)     state or imply an ability to influence improperly a government agency or official;

'(f)     knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

56

'(g)    engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.'

The hearing panel has considered three subsections of Texas Rule 8.04 and three subsections of KRPC 8.4. Additionally, the hearing panel has also considered Kan. Sup. Ct. R. 207(b) in relation to Texas Rule 8.04(a)(8).

"143.    The respondent engaged in conduct which involved dishonesty, fraud, deceit, and misrepresentation when he made many false statements in his written response to the initial complaint, as detailed in ¶ 157, below. Accordingly, the hearing panel concludes that the respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation in violation of Texas Rule 8.04(a)(3) and KRPC 8.4(c).

"144.    The respondent engaged in conduct constituting the obstruction of justice and which was prejudicial to the administration of justice when he failed or refused to provide the disciplinary administrator with the tax returns, schedules, and forms as requested by the disciplinary administrator and ordered by the hearing panel. As such, the hearing panel concludes that the respondent engaged in conduct constituting the obstruction of justice and which was prejudicial to the administration of justice in violation of Texas Rule 8.04(a)(4) and KRPC 8.4(d).

"145.    When the respondent failed to comply with the administrative requirements of maintaining his law license in Kansas, the respondent engaged in conduct that adversely reflects on the respondent's fitness to practice law. The respondent consistently failed to keep his law license in effect and provided the Clerk of the Appellate Courts and the Kansas CLE Commission with checks to pay the annual fees which were returned because of insufficient funds. Passing bad checks to the Clerk of the Appellate Court and the Kansas CLE Commission constitutes engaging in conduct that adversely reflects on the respondent's fitness to practice law. Further, when the respondent failed to comply with court orders and rules, he likewise engaged in conduct that adversely reflects on his fitness to practice law. During the disciplinary case, the hearing panel directed the respondent to provide certain tax returns, schedules, and forms to the disciplinary administrator. The respondent did not provide all of the requested information until July 27, 2016, the third day of the hearing on the amended formal

57

complaint. Also, the hearing panel directed the respondent to provide certain medical evidence to establish the necessity for the continuance of the hearing on the amended formal complaint from May 2016, to July 2016. The respondent failed to comply with the hearing panel's order. The respondent's repeated failure to comply with orders of the hearing panel adversely reflects on the respondent's fitness to practice law. Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(g).

"146.    Finally, it appears that Kan. Sup. Ct. R. 207(b) loosely corresponds to Texas Rule 8.04(a)(8). Kan. Sup. Ct. R. 207(b) provides:

'It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he or she may have affecting such matters.'

And, Texas Rule 8.04(a)(8) provides that a lawyer shall not:

'fail to timely furnish to the Chief Disciplinary Counsel's office or a district grievance committee a response or other information as required by the Texas Rules of Disciplinary Procedure, unless he or she in good faith timely asserts a privilege or other legal ground for failure to do so.'

Both rules require the respondent to cooperate in disciplinary investigations by providing documents requested by the disciplinary authorities of the respective states. In this case, the respondent failed to timely furnish to the disciplinary administrator the tax returns, schedules, and forms as requested by the disciplinary administrator and ordered by the hearing panel without, in good faith, asserting a privilege or other legal ground for his failure or refusal to provide the information. Thus, the hearing panel concludes that the respondent failed to timely furnish information requested by the disciplinary administrator and ordered by the hearing panel in violation of Texas Rule 8.04(a)(8) and Kan. Sup. Ct. R. 207(b).

58

"147.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"148.    *Duty Violated*. The respondent violated his duty to his clients to provide competent representation, diligent representation, and adequate communication. The respondent also violated his duty to his clients to charge reasonable fees and to properly safeguard his clients' property. The respondent violated his duty to the legal profession to cooperate in disciplinary proceedings. Finally, the respondent violated his duty to the public to maintain his personal integrity.

"149.    *Mental State*. The respondent knowingly and intentionally violated his duties.

"150.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to his clients and to the legal profession.

"Aggravating and Mitigating Factors

"151.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"152.    *Dishonest or Selfish Motive*. The respondent's misconduct was motivated by dishonesty and selfishness. The respondent received $2,170,808.49 from U.I. While it would be very difficult to determine how much the respondent earned, the great majority of the fee was clearly unearned. The fee was unreasonable and the respondent should

have returned the unearned fees without forcing U.I. to file suit against him. The respondent charged J.Z. a total of $7,295. The respondent did not earn any of that money and retained the unearned fees and the unused filing fee for himself. Based on the bank records, the hearing panel concludes that the respondent converted the fees paid by J.Z. to the respondent's personal use. During the disciplinary investigation and prosecution, the respondent repeatedly made false statements. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness.

"153. *A Pattern of Misconduct*. The respondent has engaged in a pattern of misconduct. First, the respondent repeatedly failed to comply with the annual registration requirements which resulted in six administrative suspensions. Second, the respondent failed to properly communicate with both U.I. and J.Z. Next, the respondent repeatedly engaged in dishonest conduct. Finally, the respondent repeatedly violated the safekeeping rules by depositing personal funds into his attorney trust account and commingling those personal funds with funds belonging to his clients.

"154. *Multiple Offenses*. The respondent committed multiple rule violations. As set forth above, the respondent violated Texas Disciplinary Rules of Professional Conduct 1.01, 1.03, 1.04, 1.14, 1.15, 3.04, 8.01, and 8.04. Likewise, the respondent violated KRPC 1.1, 1.3, 1.4, 1.5, 1.15, 1.16, 3.4, 8.1, 8.4, and Kan. Sup. Ct. R. 207. Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"155. *Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process*. The disciplinary administrator repeatedly directed the respondent to provide certain information—tax returns, schedules, and forms, trust account records, bank records, and a settlement agreement. The respondent eventually provided some of the materials. However, the respondent failed to provide tax returns until day three of the five-day hearing. The respondent retained an accountant to prepare the tax returns during the hearing and while the respondent stated that the tax returns were filed, the respondent provided no evidence to establish the same. The respondent's continuous failure to provide materials requested by the disciplinary administrator amounts to bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules and orders of the disciplinary

60

process. Further, the hearing panel directed the respondent to provide certain medical evidence establishing the necessity of the continuance of the hearing on the amended formal complaint from May 2016, to July 2016. The respondent failed to provide the evidence ordered by the hearing panel. Thus, the hearing panel concludes that the respondent engaged in a bad faith obstruction of the disciplinary process by intentionally failing to comply with rules and orders of the disciplinary process.

"156.    *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*. In the respondent's written response to the initial complaint, in a petition and affidavit filed by the respondent in July 2016, and during the hearing on this matter, the respondent repeatedly submitted false evidence, false statements, and engaged in deceptive practices as detailed below.

"157.    Response to the Initial Complaint. The respondent's written response to the complaint regarding his representation of U.I. (including the embedded summary of services rendered and summary of expenses) contains many false statements. The hearing panel includes the following paragraphs as examples of the respondent's false statements and not as an exhaustive list of the false statements made by the respondent in his written response:

'a.    The respondent stated, "Respondent also traveled to Joe Corley Detention facility [*sic*] with Mr. Martinez on numerous occasions to visit and to discuss with [U.I.] on his matter." Mr. Martinez never traveled to the prison with the respondent. Because Mr. Martinez never traveled to the prison with the respondent, the hearing panel concludes that the respondent's statement to that effect is false.

'b.    The respondent stated, "Respondent also traveled to Joe Corley Detention facility [*sic*] with Mr. Pena on numerous occasions to visit and to discuss with [U.I.] on his matter. Mr. Pena was later hired by Respondent upon [U.I.]'s approval as part of [U.I.]'s defense team on or around 07/18/2009. Mr. Pena was paid by Prince & Associates, P.C." On September 4, 2009, Mr. Pena died. As detailed above, Ms. Pena testified at the hearing on the formal complaint. *See* ¶ 58, above. Ms. Pena's

61

testimony was credible and compelling. Based on Ms. Pena's testimony and other evidence, the hearing panel finds the respondent's statements that he traveled with Mr. Pena to the prison, that he retained Mr. Pena to represent U.I., and that he paid Mr. Pena to be false.

'c.     In the summary of services rendered, the respondent asserted that on July 10, 2009, he spent 5 hours as follows: "Meeting with attorneys Pena & Martinez, Negotiation of Martinez Retainer contract, Review of [U.I.]'s case." The respondent's associated fee was $1,500. The respondent did meet with Mr. Martinez that day but they spent only about 45 minutes completing the items listed. The hearing panel finds that the respondent's statement, that he spent 5 hours meeting with Mr. Martinez and Mr. Pena and negotiating Mr. Martinez' contract, to be false.

'd.     The respondent asserted that on July 10, 2009, he spent 6 hours as follows: "Meeting with Attorney Pena, negotiation of Pena's retainer contract @ 7322 Southwest Freeway, Suite 1900, Houston Texas." The respondent's associated fee was $1,800. The respondent did not retain Mr. Pena to represent U.I. Mr. Pena simply shadowed Mr. Martinez in an attempt to learn from more experienced attorneys. The hearing panel finds that the respondent's statements, that he spent 6 hours meeting with Mr. Pena and negotiating Mr. Pena's contract, to be false.

'e.     The respondent asserted that on July 10, 2009, he spent 1.1 hours as follows: "Traveling to Joe Corley Detention Center from 7322 Southwest Freeway, Houston Texas to see [U.I.] with Pena & Martinez" and he spent 3 hours as follows: "Meeting with [U.I.] at Joe Corley Detention Center with Pena & Martinez to discuss [U.I.]'s case and get approval for hiring Pena & Martinez." The respondent's associated fees were respectively $330 and $900. The respondent did not travel with Mr. Martinez and Mr. Pena to the prison. The respondent spent only 30 minutes with Mr. Pena and Mr. Martinez at the prison. The hearing panel finds the respondent's statement, that he traveled with Mr.

62

Pena and Mr. Martinez and spent three hours meeting with U.I., Mr. Martinez, and Mr. Pena in the prison, to be false.

'f.      The respondent asserted that between July 16, 2009, and August 13, 2009, he spent 17 hours per day for a total of 476 hours, conducting research, meeting with attorneys, preparing for the detention hearing, hiring a private investigator, preparing witnesses for the detention hearing, meeting with the prosecutor by telephone, attending the detention hearing, reviewing [U.I.]'s criminal records in preparation for the bond hearing, reviewing updated federal court records, participating in the detention hearing, and meeting with U.I., his children, his Nigerian family, and his bank manager by telephone on numerous occasions. The respondent's associated fee was $142,800. During that time, Mr. Martinez was the attorney of record in U.I.'s criminal case. The respondent did not provide Mr. Martinez with any research nor did he provide any notes or summaries from the various meetings described. The respondent did not provide Mr. Martinez with any work product. The respondent did not assist Mr. Martinez in preparing for the detention hearing. Mr. Martinez did not authorize the respondent to conference with the prosecutor. It was not necessary for the respondent to travel to the federal court to review the court records, as Mr. Martinez had a copy of all court records. Mr. Martinez testified if the respondent met with and hired a private investigator, it was unnecessary. There is no work product or corroborating evidence of any type that the respondent spent 17 hours per day working for 28 straight days on the respondent's case. The hearing panel finds the respondent's statements in this regard to be false. *See also* ¶ 160(c), below.

'g.      In the summary of the expenses incurred, the respondent asserted that he paid attorney Stephen Pena $50,000 for "professional fees in connection with [U.I.]'s case." Based on Ms. Pena's compelling testimony and other evidence, the hearing panel concludes that the respondent did not pay Mr. Pena $50,000 to represent U.I. Accordingly,

the hearing panel concludes that the respondent's statement to that effect in the summary of expenses incurred is false.'

"158.    Petition and Affidavit. In July 2016, Univision, an American Spanish broadcast television network, ran a series of investigative reports regarding the respondent. After the programs were aired, the respondent filed suit against Univision, Raed Gonzalez, and J.Z., seeking $100,000.

a.    In the respondent's petition and in an affidavit which accompanied the petition, the respondent asserted:

'Plaintiff asserts that his law license from the State of Kansas is still active and valid and that he is in good standing with the issuing state. Plaintiff agrees that his license was temporarily suspended in the past for failure to attend the CLE class which the plaintiff immediately completed and his license to practice law was immediately reinstated.'

Prior to the time the respondent filed the petition and affidavit, the respondent's license to practice law in the State of Kansas had been suspended on five occasions. Aggregating the periods of suspensions, the respondent's Kansas license to practice law was suspended for more than 9 months. Further, the respondent's license to practice immigration law was suspended in December 2015, and remains suspended. Additionally, the respondent allowed his license to practice in the United States District Court for the District of Kansas, the United States District Court for the Southern District of Texas, and the United States Court of Appeals for the Fifth Circuit to expire or terminate for failing to pay required fees. Thus, the respondent's statements that his license was temporarily suspended in the past are deceptive.

b.    The respondent made an additional false statement in the petition and affidavit. The respondent asserted:

64

'Plaintiff also asserts that he was not even the actual attorney who previously represented Defendant [J.Z.]. Therefore, the assertion from [J.Z.] and his contention over the television that Plaintiff represented him was flatly false.'

As stated in ¶ 91, above, the hearing panel concluded that the respondent represented J.Z. and the respondent's statements to the contrary were false. As such, the hearing panel likewise concludes that the respondent's statements in the petition and affidavit are also false.

"159.    Hearing. In weighing the evidence presented at the hearing on this matter, the hearing panel considered many things, including each witness' motive to fabricate. After considering (1) whether each witness had a motive to fabricate evidence in this case, (2) whether the testimony of each witness was consistent with other witness testimony, (3) whether the testimony of each witness was consistent with other statements made by that witness, (4) whether the testimony of each witness was consistent with exhibits admitted into evidence, and (5) the demeanor of the witness during the proceedings, the hearing panel concludes that the respondent testified falsely and the hearing panel accepts the testimony of other witnesses. Specifically, the hearing panel concludes that the respondent had a motive to fabricate and the respondent's motive was based on the respondent's desire to maintain his law license.

"160.    *False Testimony*. The hearing panel provides the following by way of example and not as an exhaustive list of the false statements made by the respondent during his testimony:

a.       The respondent initially testified that he had not tried any jury trials. Later, he asserted that he had tried one jury trial, however, he could not remember his client's name, the nature of the case, or when it was tried. The hearing panel finds that the respondent testified falsely in the disciplinary proceeding when he testified that he had tried a case to a jury.

65

b.    The respondent denied receiving two letters from U.I. requesting an accounting of the fee paid. Additionally, the respondent testified:

'Q.    You don't know whether he didn't send them to you, your testimony is you didn't receive them?

'A.    He made these documents up. He never sent these documents to me. He made them up.

'Q.    He made them up?

'A.    Yes, this one and that other one.

'Q.    How do you know that?

'A.    I'm sorry?

'Q.    How do you know that he made them up?

'A.    Because [U.I.]—I was working with some— [U.I.], they were all happy with me until the jury says you are guilty of 55 counts. That's when everything changed. He made this up. He never sent them to me.'

However, on December 14, 2009, the respondent sent an electronic mail message to James Okorafor which provided:

'Thanks for that information. I have those concerns as well. I do not know how I was cheating [U.I.]. I have the right to keep reasonable amount of money for my attorney fees because of all the trouble I have gone through because of this case. My fees will not be based on hourly rates just like other lawyers but on what my

66

law firm have lost in getting involved in this case. What about those lawyers that asked for millions of dollars up front before even talking to [U.I.]? <u>At this time my prayer is for [U.I.] to be out before I tender my final bill to him. I just want to feel that I have helped him before I stress a lot about money unless I am well convinced that he might not get out.</u> I am aware these issues may come up in the future and believe me I am well documented to disprove any allegations and perhaps seek additional legal recourse for any slander or frivolous accusation. Just like you noticed, NO OTHER LAWYER WOULD HELP [U.I.] THE WAY I DID. But if [U.I.] continues to feel this way about me, I plan to exit this case immediately and I will make sure I am compensated. Thanks.'

Clearly, by December 2009, based upon the respondent's message to Mr. Okorafor, U.I. was questioning how the respondent was using the funds entrusted to him. Because it is consistent with other evidence, the hearing panel finds that U.I. sent the respondent the two letters and the respondent's statements to the contrary are false. Further, the hearing panel concludes that the respondent's testimony that U.I. was satisfied with the respondent's representation until U.I. was convicted, is likewise false.

      c.      At the hearing on this matter, the respondent explained for the first time, that the summary of services rendered included work that he completed, as well as others in his law firm. For example, he explained that he did not work 17 hours per day beginning July 16, 2009 and continuing through August 13, 2009, on U.I.'s case, but rather he and others in his office combined to work the hours listed in his summary of services rendered. The respondent's response to the initial complaint does not include that explanation. Contrarily, the respondent included a column titled, "activities performed by respondent" in the summary of

67

services rendered. Accordingly, in addition to finding the statements made in DA Exhibit 4 to be false, the hearing panel also concludes that the respondent's testimony that his summary referred to himself as well as others in his office to also be false.

d.　　　The respondent testified that he hired Mr. Pena, that he hired Mr. Pena before he hired Mr. Martinez, that he paid Mr. Pena $50,000 for the representation, and that the $40,000 that Mr. Martinez agreed to was only a down payment and was not the entirety of the fee agreement with Mr. Martinez, as follows:

'Q.　　　And entry 129 you indicate you gave a cashier's check to Attorney Pena in the amount of $50,000?

'A.　　　That's correct.

'Q.　　　Is it your testimony here today that, in fact, you give a cashier's check to him for $50,000?

'A.　　　Yes. And I had a witness.

'Q.　　　On July 20th of 2009?

'A.　　　Yes.

. . . .

'Q.　　　Well, here's—you're kind of taking care of [U.I.]'s money or making sure it's well spent. What I don't understand is the lawyer who's handling the bond hearing, primarily responsible for the case in this case has $10,000 from you and Mr. Pena, who doesn't really have a lot of experience, has $50,000 from you.

68

'A.     Pena was hired first. Pena was hired first before Ralph Martinez. Pena was under—

'Q.     So why didn't you hire him? Why didn't he do the bond hearing?

'A.     Who, Pena?

'Q.     Who [*sic*] didn't Pena do the bond hearing?

'A.     Pena was one of them. As I said before, we hired team of lawyers, not just one lawyer. The $40,000 you talking about with Ralph Martinez was a down payment. He obviously lied here. It was a down payment. It was not only money. There's no way anyone with 37 years—

'Q.     Wait a minute. You're saying Mr. Martinez was lying?

'A.     Yeah. The money was down payment.

'Q.     What was he lying about?

'A.     The down payment. The $40,000 was down payment. It wasn't money—it was not just—

'Q.     Run that by me again, I'm sorry. Well, first of all let me ask you, the bank records, Exhibit 82, which is a demonstrative exhibits, shows Ralph Martinez was paid on July 18th of 2009 in the amount of $10,000. And according to you—

'A.     Yeah, I know that. I know that. Yes, I know that.

'Q.     According to your accounting it was July 20th of 2009 you paid Pena $50,000.

'A.     Yes, of course.'

The respondent's testimony on these matters is inconsistent with other evidence presented to the hearing panel. Based on all the evidence presented, including the testimony of Mr. Martinez, Ms. Pena, and the respondent, the hearing panel concludes that the respondent's testimony that he hired Mr. Pena, that he hired Mr. Pena before he hired Mr. Martinez, that he paid Mr. Pena $50,000, and that the $40,000 that Mr. Martinez agreed to was only a down payment toward Mr. Martinez's fee was false.

"161.   *Other Deceptive Practices.* During the cross-examination of the disciplinary administrator's witness, Mr. Gonzalez, the respondent asked questions which implied that Mr. Gonzalez, as attorney for J.Z., submitted an official application on behalf of J.Z. which intentionally misrepresented J.Z.'s residence and status in the United States.

'Q.     . . . In regards to the law, the Fifth Circuit law that you used to reopen your client's case, if [J.Z.] have remained in Mexico, would he have been entitled to reopen? . . .

. . . .

'MR. NWAKANMA:  You have to listen to me, if his client had remained over there he would not have been entitled to that relief, and for him to reopen means that he may have lied to the government that his client was there. You know, was in the United States. His client was supposed to have been over there. If he was over there he would not have been entitled to obtain that green card. So I want to show whether he disclosed that when he filed the motion to reopen that his client came

70

back here, because if his client came back here illegally, the client would not have been entitled to that.

. . . .

'Q.     He was lying—

'A.     Why would I lie to the government? Are you implicating that I am a liar, sir? I take offense to what you're saying right now.

'Q.     Can you provide—

'A.     I'm an officer of the court and I would never lie or misrepresent anything to the government or to this court. I did not come here to be insulted by anyone, sir.

'Q.     Can you provide—

'A.     And I have not lied to the government ever.

'Q.     If you provide a copy of the motion to reopen, would it show that you told the government that your client came back here?

'A.     . . . But I did not make any misrepresentations to the court. . . . But I can assure you that I have never made a misrepresentation to the court.'

Mr. Gonzalez was understandably upset at the accusation and its implication. When asked if he had evidence to show that misrepresentation, respondent initially replied that he had none. The hearing panel admonished the respondent and apologized to Mr. Gonzales.

"162.    The following day, the respondent offered Exhibit 49 which consisted of 8 C.F.R. § 1003.2 and the September/October 2013 edition of the *Immigration Law*

71

*Advisor*. The respondent asserted that Exhibit 49 established that J.Z. was not eligible to have a motion to reopen filed on his behalf. The article included in the September/October 2013 edition of the *Immigration Law Advisor* included a summary of the Fifth Circuit case relied on by Mr. Gonzalez which stands for the opposite of what the respondent was arguing:

> 'In two companion cases, the Fifth Circuit rejected the departure bar as it applies to both statutory motions to reconsider and reopen. *Lari v. Holder*, 697 F.3d 273 (5th Cir. 2012) (addressing motions to reconsider); *Garcia-Carias v. Holder*, 697 F.3d 257 (5th Cir. 2012) (addressing motions to reopen). The court found that it needed go no further than *Chevron*'s first step because sections 240(c)(6) and (7) [] ambiguously give an alien a right to file a motion to reconsider or reopen regardless of whether they have left the United States. *Garcia-Carias*, 697 F.3d at 263. First, the court noted that the statutory language "conferring a right to file a motion to reopen plainly does not place any geographic restrictions on its exercise." *Id*. . . .

> 'In the Fifth Circuit, therefore, the departure regulation cannot serve as a basis for denying a statutorily authorized motion to reconsider or reopen filed by an alien who has departed the United States.'

The respondent's assertion that Exhibit 49 supported his position is misplaced, does not justify his outrageous conduct toward Mr. Gonzalez, and constituted further deceptive conduct.

"163.    Although not charged by the Disciplinary Administrator, this entire line of questioning to Mr. Gonzalez, being completely misleading (besides insulting and inappropriate), represented a violation of KRPC 3.3, in the presence of the hearing panel. *Khatib v. McDonald*, 87 Ill.App.3d 1087, 43 Ill.Dec. 266, 410 N.E.2d 266 (1980) (improper to ask misleading or untrue question on cross-examination); see also, *Izquierdo v. State*, 724 So.2d 124, 126 (Fla. App. 1998) (same).

72

"164.  The respondent's false statements and respondent's false testimony corrupted the proceeding and renders the respondent unfit for a license to practice law.

"165.  *Refusal to Acknowledge Wrongful Nature of Conduct*. Despite the overwhelming evidence against him, the respondent refused to acknowledge that he intentionally violated any rules.

a.  Specifically, the respondent refused to acknowledge his trust account violations. The respondent testified as follows:

'Q.  Well, would you agree with me that it violated safekeeping of property rule by doing that?

'A.  I don't have any recollection to that. If you showed me, maybe I can—you're just telling me, I didn't know.

'Q.  Okay. So you wouldn't agree that it violated Texas or Kansas safekeeping of property rule?

'A.  No, it did not because there was no client's funds. I did not commingle client funds. No client ever, you know, filed petitions that I, you know, either commingled, you know, or something. So when there were no client funds, how would that violate it?

. . . .

'Q.  Okay. I want to ask you a few questions about your trust account. I think we established yesterday, and today, that you do not believe it's a violation to place your personal funds in your trust account if there are no client funds in the trust account. Is that correct?

73

'A.     I'm sorry?

'Q.     I think we established yesterday, and today, from your testimony, that you don't believe it's a violation of the Safekeeping of Property Rule if you place some of your own personal funds in your IOLTA trust account or trust account so long as there are no client funds in that account. Is that correct?

'A.     That it's a violation or not a violation?

'Q.     Not a violation so long as—

'A.     Yes.

'Q.     —there are not client monies in the account?

'A.     Yes. Yes. Yes.

. . . .

'Q.     Everything we alleged against you, do you believe that you engaged in any misconduct, violated any rule at all?

'A.     I'm sorry?

'Q.     Do you believe that all that we've alleged against, you all the rules that we've alleged that you violated, do you think that you violated a single rule of Professional Conduct?

'A.     You're telling me to do—

74

'Q.    I'm asking you—I'm asking you if you think you violated a single rule of Professional Conduct?

'A.    Is this—I have to present my own case.

'Q.    I'm asking you if you think you violated a single rule of Professional Conduct?

'A.    That is for the Panel after my own case.

'CHAIRMAN BADGEROW:  If you can answer, please answer.

'THE WITNESS:  Sir, I do not know.

'CHAIRMAN BADGEROW:  You don't know?

'THE WITNESS:  I don't know actually. I do not know. If—again, let me put it this way, sir, if I'm not suppose to put my personal funds in the trust account—

'CHAIRMAN BADGEROW:  Yes.

'THE WITNESS:  —yeah, the answer is yes. I made a mistake. Absolutely, yes.

'CHAIRMAN BADGEROW:  You didn't make a mistake, you intentionally did it?

'THE WITNESS:  Yes. So I made a mistake, I'll take responsibility for that, obviously. But the point I want to make is that I didn't—at the time it was done, I had no knowledge it was wrong. I had no knowledge it was wrong.

75

'CHAIRMAN BADGEROW: What about any of the other violations that are alleged? You don't know if you violated any of the rules they've alleged?

'THE WITNESS: I do not believe, sir, my fees are unreasonable. Yes, if the rule is that I was not supposed to place any money, yes, that rule, I will take responsibility for that. And I definitely I will do whatever it take to rectify that, but at the time it was done, I had no knowledge that that was a violation.'

b. Additionally, the respondent blamed his staff for passing bad checks to the Clerk of the Kansas Supreme Court and the Kansas CLE Commission and also blamed his staff for his past suspensions:

'Q. But each year you were suspended you were aware of the suspension at some point in time, were you not?

'A. Yes.

'Q. Okay. But they continued to happen, so you didn't rectify the situation after the first, second, third, or fourth time, did you?

'A. Was a mistake made, yes. Was it taken care of, yes. Have I taken steps to make sure it do not happen again, the answer is yes.

'Q. I just want to make sure I understand completely. The person that you fired, you're not saying she is or he is responsible for the first four suspensions, are you?

76

'A.	That person worked for me for too long. You know, was working for me for quite a long time. Just like I told you earlier, I say that I give her a lot of chances, you know, because I don't like to fire employees because I'm in the employment business, so I like to work with them. Unless it got to a level that I cannot change. So I work with this person a long time. It happened to a lot of checks, not just this one, so I had to take care of this.

'Q.	So you're saying she was somewhat responsible for the previous suspensions?

'A.	That's correct.'

The respondent's refusal to acknowledge the wrongful nature of his conduct further aggravates this matter.

"166.	*Vulnerability of Victim*. As an illegal resident at the time, J.Z. was vulnerable to the respondent's misconduct.

"167.	*Indifference to Making Restitution*. The respondent failed to make restitution to J.Z. for $7,295.

"168.	In addition to the aggravating factors previously accepted and considered by the Kansas Supreme Court, the hearing panel also finds the following matters to aggravate the respondent's misconduct.

"169.	*Administrative Suspensions.* On five previous occasions, the respondent violated Kan. Sup. Ct. R. 208 and Kan. Sup. Ct. R. 802 by failing to comply with the annual administrative requirements to maintain his license. Even after participating in a 5-day attorney disciplinary hearing where the question of the respondent's current compliance was raised, the respondent again failed to attend to the annual requirements to

maintain a license to practice law. The respondent's repeated failure to comply with the rules of the Kansas Supreme Court aggravates the respondent's misconduct in this case.

"170.    *Circumventing Restitution*. In settling his dispute with U.I., the respondent entered into a confidential written settlement agreement which provided, in part, as follows:

> 'c.        The sequence of events related to the implementation of this Settlement Agreement shall be as follows:  Attorney shall purchase two bank drafts of $100K each made out in the name of Attorney Tola Oresusi and [U.I.'s son] as Agent in Fact of [U.I.]; and shall also issued [*sic*] checks payable to the same persons in amounts of not less than $10K for the balance of the $225K. The first check and subsequent checks shall be due and payable on the last day of the month following the date on which the Kansas Disciplinary Action is terminated, or the last day of the month after the State Bar of Kansas acknowledges [U.I.]'s intent to dismiss the Kansas Proceedings, whichever occurs first in time.'

The hearing panel concludes that the respondent agreed to pay Mr. Oresusi and U.I.'s son so that the settlement proceeds paid by the respondent would not be seized by the United States government and applied to the $30,000,000 owed to Medicare and Medicaid. The hearing panel concludes that entering into an agreement to settle a dispute with U.I. in this fashion circumvented the United States from collecting restitution.

"171.    Further, the hearing panel finds that the way the respondent and U.I. structured the attorney fee agreement also had the net effect of circumventing restitution. U.I. paid the respondent more than $2 million. The respondent used some of that money to pay U.I.'s mortgages and U.I.'s children's school fees, which effectively circumvented collection by the United States government.

"172.    *Threat to Disclose*. In a letter to Mr. Oresusi, U.I.'s subsequent counsel, the respondent made a veiled threat to disclose U.I.'s assets hidden in Nigeria. Specifically, the respondent stated, 'I am willing to disclose the source of my information and to work with you to formally advise the US government about your client's hidden

78

assets in Nigeria if you need my help.' The respondent's threat to disclose his client's confidential information is further evidence in aggravation.

"173.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstance present:

"174.    *Absence of a Prior Disciplinary Record*. The respondent has not previously been disciplined after having been found to have violated the Kansas Rules of Professional Conduct. However, on six occasions, the Kansas Supreme Court has suspended the respondent's license to practice law for failing to comply with the annual administrative requirements. Additionally, the Board of Immigration Appeals indefinitely suspended the respondent for failing to comply with the annual administrative requirements in Kansas.

"175.    *Physical Disability.* The respondent suffers from hypertension, diabetes mellitus, obstructive sleep apnea, and chronic kidney disease. The respondent was hospitalized, complaining of chest pains, shortness of breath, and headaches.

"176.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.41    Disbarment is generally appropriate when:

(a)    a lawyer abandons the practice and causes serious or potentially serious injury to a client; or

(b)    a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

79

(c)     a lawyer engages in a pattern of neglect with
        respect to client matters and causes serious or
        potentially serious injury to a client.

. . . .

'4.51   Disbarment is generally appropriate when a lawyer's course of
        conduct demonstrates that the lawyer does not understand the
        most fundamental legal doctrines or procedures, and the lawyer's
        conduct causes injury or potential injury to a client.

. . . .

'5.11   Disbarment is generally appropriate when:

        . . . .

        (b)     a lawyer engages in any other intentional
                conduct involving dishonesty, fraud, deceit, or
                misrepresentation that seriously adversely
                reflects on the lawyer's fitness to practice.

. . . .

'6.11   Disbarment is generally appropriate when a lawyer, with the
        intent to deceive the court, makes a false statement, submits a
        false document, or improperly withholds material information,
        and causes serious or potentially seriously injury to a party, or
        causes a significant or potentially significant adverse effect on
        the legal proceeding.'

"177. The disciplinary administrator recommended that the respondent be disbarred. The respondent denied intentionally violating the rules. The respondent made no recommendation as to discipline.

"178. The respondent engaged in repeated dishonest conduct—in his practice and before the hearing panel. The respondent caused serious injury to his clients and to the legal profession. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be disbarred.

"179. The primary purpose of the disciplinary process is to protect the public. The hearing panel notes that achieving the purpose in this case is a difficult matter. The respondent's practice is based in Houston, Texas—nearly 600 miles from the state which issued the license to him to practice law. Nearly all the witnesses to the misconduct are likewise located hundreds of miles away. The distance created challenges to the investigation and prosecution. While the rules permit an attorney, like the respondent, to practice immigration law hundreds of miles away from the state which issued the law license, it is not in the best interest of the public to allow this practice to continue.

"180. Further, because the respondent has never been licensed to practice law in the State of Texas, but he has physically practiced solely in that state since his admission to the Kansas bar, the respondent has supposedly limited his practice to 'federal' matters, mainly in immigration. But, the testimony of the respondent himself reveals that he has, in fact, practiced law in Texas on non-federal matters, including consulting with J.Z. about the loss of his commercial driver's license, handling a personal injury case and achieving a settlement, and in negotiating with U.I.'s mortgage lenders. This appears to represent the unauthorized practice of law in Texas. Texas Government Code § 83.001(a). Therefore, the hearing panel recommends that the disciplinary administrator refer this report to the Unauthorized Practice of Law Committee of the State of Texas.

"181.    Finally, the hearing panel recommends that the disciplinary administrator file a motion seeking the temporary suspension of the respondent's license to practice law while the disciplinary case is pending, under Kan. Sup. Ct. R. 203(b), for the following reasons:  First, the respondent repeatedly engaged in dishonest conduct. Second, as described in the preceding paragraph, although the respondent claims his practice in Texas is and was limited to 'federal' practice, in fact he has engaged in the practice of state law in Texas. Third, the nature of the misconduct in J.Z.'s case—taking advanced fees and failing to perform the services—puts the respondent's clients at great risk of continued financial loss.

"182.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint and the amended complaints, to which he filed answers; he filed no exceptions to the hearing panel's final hearing report. With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2017 Kan. S. Ct. R. 255). Furthermore, the evidence before the hearing panel establishes the charged misconduct in violation of Texas Disciplinary Rules of Professional Conduct:  1.01 (competence and diligence); 1.03 (communication); 1.04 (fees); 1.14 (safekeeping property); 1.15

(declining or terminating representation); 3.04 (fairness in adjudicatory proceedings); 8.01 (bar admission, reinstatement, and disciplinary matters); and 8.04 (misconduct) and Kansas Rules of Professional Conduct: 1.1 (2017 Kan. S. Ct. R. 287) (competence); 1.3 (2017 Kan. S. Ct. R. 290) (diligence); 1.4 (2017 Kan. S. Ct. R. 291) (communication); 1.5 (2017 Kan. S. Ct. R. 292) (fees); 1.15 (2017 Kan. S. Ct. R. 326) (safekeeping of property); 1.16 (2017 Kan. S. Ct. R. 331) (termination of representation); 3.4 (2017 Kan. S. Ct. R. 345) (fairness to opposing party and counsel); 8.1 (2017 Kan. S. Ct. R. 377) (bar admission and disciplinary matters); 8.4 (2017 Kan. S. Ct. R. 379) (misconduct); and Kansas Supreme Court Rule 207 (2017 Kan. S. Ct. R. 246) (cooperation) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before the panel, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent be disbarred. The respondent made no recommendation as to discipline. The hearing panel recommended that respondent be disbarred.

Nwakanma's hearing before us was scheduled for May 3, 2017, at 9 a.m. Notice to Attorneys of the scheduled May docket was filed March 16, 2017, and an appearance letter was sent to respondent on April 5, 2017. On May 1 and 2, 2017, Nwakanma filed two emergency motions for a continuance, stating he was unable to attend the hearing on May 3 due to a family medical need. His daughter had broken her arm on April 30, 2017, and was scheduled for a follow up appointment on the day of the hearing. We granted the motions in order to permit Nwakanma to attend his daughter's doctor's appointment and continued the case for hearing to May 4, 2017, at 1:30 p.m. On May 4, 2017, Nwakanma filed a motion to be excused from the hearing, and he failed to appear. Chief Justice Nuss orally noted Nwakanma's motion at the outset of the hearing stating:

"About an hour or so ago we got a fax filing. . . . Just for the record I wanted to indicate that instead of his being here today, what he sent us was his appearance in the Municipal Court of Sugarland, Texas, to appear to plead no contest to the offense of illegal parking, and it appears to indicate handicapped parking stall and there was a document attached to that to confirm he was in Municipal Court at that time.

"It is the opinion of the court that we gave him adequate notice to attend today and his priority, at least in my view, was to come here to defend himself and his law license instead of going to Municipal Court. So with that background in mind we will proceed."

We proceeded with the hearing, at which the Disciplinary Administrator continued to recommend disbarment. As such, we now formally deny Nwakanma's motion to be excused from the hearing on this matter and, further, agree with the recommendation of both the Disciplinary Administrator and the panel. We hold that respondent is disbarred from the practice of law in the state of Kansas and enter judgment as follows.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Uchechi Okechukwu Nwakanma be and he is hereby disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2017 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2017 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.